**TOLEDO TRUST COMPANY, as Executor of the Estate of Henry T. Ritter, Deceased, Plaintiff,**

v.

**William N. NYE et al., Defendants.**

Civ. No. C 72–281.

United States District Court, N. D. Ohio, W. D.

Jan. 18, 1977.

Judgment Feb. 9, 1977.

Willis C. Bullard, Detroit, Mich., for plaintiff.

Charles W. Peckinpaugh, Jr., Ralph S. Boggs, Toledo, Ohio, for defendants.

OPINION AND ORDER

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

DON J. YOUNG, District Judge.

This matter, after rather protracted preliminary proceedings, was tried to the Court, sitting without a jury, for three days, starting April 21, 1975. The final written arguments of the parties were filed late in August of that year, but the disruption of the Court's work resulting from the

prolonged jury trial in the Kent State civil cases, and an unprecedented spate of trials, both civil and criminal, has deprived the Court of the time necessary to analyze and decide the matter as promptly as it should have.

This opinion will serve as the Court's findings of fact and conclusions of law upon the issues presented. The memorandum of the Court filed February 25, 1975, and published in 392 F.Supp. 484, briefly states the history of the matter and the issues presented. Rather than repeating these matters at length, the Court incorporates that memorandum in this opinion by reference, as fully, for all intents and purposes, as if set forth at length herein. The Court also incorporates by reference its oral opinion overruling the defendants' motions for judgment in their favor, which appears on pages 187A through 187E of the transcript of the April 1975 hearing.

When the evidence is viewed as a whole, it appears that the plaintiff's decedent, Henry T. Ritter (hereinafter Ritter), died on May 17, 1968, the owner of 143 shares of stock of the defendant Lantana Flower Farms, Inc. (hereinafter Lantana). Lantana had been incorporated some years previously by Ritter and the defendants William N. Nye (hereinafter Nye), Jackson Kamison (hereinafter Kamison), and Pinckney S. Cook (hereinafter Cook). Mr. Nye and Mrs. Cook were also shareholders of Lantana. The object of Ritter, Cook and Kamison was to profit by furnishing capital which would enable Nye to make full use of his knowledge of commercial floriculture. After the venture was launched, Nye took advantage of his abilities to require Ritter, Cook, and Kamison to give him enough of their shares so that he had the controlling interest in Lantana.

As the Court pointed out in its memorandum of February 25, 1975, this was a legitimate commercial transaction. The other members of Lantana needed Nye. He set his price, and they paid it. Thus when the defendants argue at this juncture that the defendant United Brands, formerly United Fruit Company (hereinafter United) paid the large price that it did for Lantana not because of Lantana's intrinsic value, but in order to acquire Nye, they conveniently overlook the fact that United was buying from the shareholders of Lantana an asset which the shareholders had already paid well for.

The real issue in this case involves the stock option provision which Ritter caused to be incorporated in Lantana's charter. The entire option provision, Article XI of the By-Laws of Lantana, entitled "Restrictions on Transfer of Shares" is long and involved, and will be summarized, rather than being set forth at length herein.

Lantana had, under Article XI, the option to purchase any shareholder's shares for thirty days after the death of the shareholder. This option was to be exercised by giving written notice specifying the number of shares and the price per share believed by Lantana to be the fair market value of the shares, and fixing a time, not later than ten days after the date of the notice, and the place where it proposed to close the transaction.

Article XI further provides that the price per share shall be an amount per share equal to the fair market value of the shares as of the end of the month immediately preceding the exercise of the option by the corporation. As used in the article, the term "fair market value" is defined as meaning either,

"(a) the value agreed upon by the corporation and the shareholder, in which case the closing shall be held at the time and place specified in the corporation's notice unless otherwise agreed upon by the parties," or

"(b) if they are unable to agree upon such value by the time of closing specified in the corporation's notice of exercise, the fair market value shall be the higher of"

the book value of the shares or a multiple of the average earnings per common share over a stated period.

On June 7, 1968, Richard E. Castor (hereinafter Castor) mailed a notice signed by Nye exercising Lantana's option to pur-

chase and stating a price of $50.00 per share for the 143 shares owned by Ritter, the transaction to be closed on June 14, 1968 in Castor's office in Florida. On June 19, 1968, Clarence Hyrne, one of plaintiff's trust officers, visited Nye and Castor in Florida. He asked for information about Lantana and requested an extension of time for closing the transaction, because of the complexity of the Ritter estate. The specified time had, of course, expired some days before this visit. While no definite extension of time was then agreed upon, the time was in fact extended to June 12, 1969; that is, ten days after the deposit of the value finally agreed upon.

Thereafter, the matter of the purchase languished until April 10, 1969, when Castor, who was in Toledo on other business, called on Hyrne and Edward F. Weber, one of the attorneys for Ritter's estate, and suggested that Lantana would offer $88.25 a share; that is, $12,619.25 for Ritter's stock.

Unbeknownst to Castor, some time in December Fletcher A. Hatch, Jr., (hereinafter Hatch) and Jack Finn, employees of United, sailng under false colors, had visited Nye and looked over Lantana's operations. United at that time was considering diversification by entering the business of floriculture. On March 12, 1969, Hatch and other employees of United again visited Nye. This time they disclosed their relationship to United and United's interest in going into the floriculture business. They also told Nye that Lantana was a candidate for purchase by United. On April 1 and 2, 1969, one of United's auditors and one of United's accountants conferred with Nye and Lantana's accountant, Edward Brown (hereinafter Brown).

At the early April meetings Nye denied United access to Lantana's records on the grounds that negotiations had not gone far enough, but he did assure them that Kamison and Cook would concur with his decisions on the sale of Lantana. Nye indicated that he knew United was interested in Lantana, that he would like negotiations to get more serious, so he could get a feel for the purchase price United was considering and the type of tender it would make. Cagily, he told United's people he did not care whether or not it wanted him to continue with Lantana.

Nye did not communicate these matters to Kamison and Cook until some time late in May. A meeting of the stockholders and directors of Lantana, the first since April, 1968, was held on June 2, 1969. The meeting discussed a possible sale to United, and decided that all the stockholders would go to Boston on June 12 and 13, 1969, to negotiate the possible sale, and that the price would have to be in the close neighborhood of three million dollars. On June 13, 1969, Nye talked with one William S. Madden, an employee of United, about a range of prices for Lantana.

On June 20, 1969, another meeting was held in Boston by Nye, Cook, and Kamison and representatives of United. The price was agreed upon, subject to ratification by the directors of United. The price was $2,600,000.00 plus an additional sum of $150,000.00 if within a nine or ten month period Nye, as manager of Lantana, could double its production. This he succeeded in doing, so the actual price paid was $2,750,000.00. The sale documents were executed on August 15, 1969. The purchase price was apportioned $1,655,146.00 to Nye and Mrs. Nye, $472,426.00 to Cook and Mrs. Cook, and $472,426.00 to Kamison.

While some of these things were going on, after the April 10, 1969 meeting with Castor, the plaintiff was still holding out for more money. Hyrne wrote to Castor on April 10, 1969, summarizing their meeting and saying, "We are now concerned with arriving at the fair market value of those shares, either by agreement or by the application of the by-laws." After his return from Toledo on April 16, 1969, Castor wrote Brown for information to calculate the book value of Ritter's stock in Lantana. According to Brown, this was the first concrete information he had that Lantana desired to exercise the stock option. Brown did the necessary work and sent the information to Castor in a letter dated April 21, 1969.

On May 19, 1969, Lantana deposited $14,-607.24, the computed book value of the Ritter stock, in a Florida bank, and Castor wrote to Weber saying that the deposit had been made and Ritter's stock cancelled in accordance with the provisions of Article XI of Lantana's by-laws. Obviously, Nye was fearful that the plaintiff would find out what Ritter's stock was really worth, and was trying to take advantage of the technical provisions of the by-laws to gain an unfair advantage.

Although there is much argument among counsel as to the timing, the Court has no doubt from the whole of the evidence that on or about May 19, 1969, Nye called the plaintiff and said "Well, let's round it off at $15,000.00. That's more than fair." On June 2, 1969, Lantana deposited the additional sum of $392.76 with the Florida bank. On May 26, 1969, the plaintiff had sent to that bank the certificate for Ritter's 143 shares of Lantana stock, with instructions that the bank was to pay by wire $15,000.00 to the plaintiff for the stock.

After the purchase agreement among the defendants was signed, United apparently had some misgivings about the manner in which Ritter's interest had been acquired by Lantana, and took the matter up with George Allen, an attorney who had represented Nye in connection with the purchase of Lantana by United. Allen, on December 18, 1969, wrote United that to attempt to get the plaintiff to ratify the Ritter transaction after a full disclosure of the sale of Lantana was unnecessary and would only cause trouble, a clear admission of doubt as to the legitimacy of the acquisition. United persisted, and on July 10, 1970, Allen again wrote, saying that he wanted to wait until an accounting had been filed in the Ritter estate. Thereafter, Nye, Mrs. Nye, Cook, Mrs. Cook, and Kamison executed and delivered to United an agreement to indemnify United and hold it harmless from any problems or liability that might result from notifying the plaintiff of the purchase by United.

On August 12, 1970, plaintiff was notified of the transactions involved in this litigation. On August 14, 1972, plaintiff commenced this action.

Up to this point the Court has made no factual findings concerning the creation of c-N-k Corporation (hereafter c-N-k) by Nye, Cook, and Kamison. This matter was not dwelt upon to any great extent in the evidence. c-N-k was formed on August 8, 1968. Nye paid in $5,000.00, and Cook and Kamison each paid in $1,430.00 for their shares in c-N-k.

On June 13, 1968, Lantana had offered to purchase from one R. D. Walker 38 acres of land located a short distance from Lantana's lands. On June 21, 1968, Walker responded with a counter-offer to sell the land for $1,500.00 an acre, that is, $57,-000.00, payable $1,000.00 down and the balance over a five year period with interest at 6% per annum on the unpaid balance.

After c-N-k was incorporated, it entered into a contract for the purchase of the land for $57,000.00, payable $10,000.00 down and the balance payable over five years with interest at 6% per annum. Thereafter c-N-k rented the land to Lantana for $18,-000.00 per year.

■ Although the defendants argue that Lantana was unable to purchase the Walker lands, the evidence leaves no doubt that it was perfectly capable of accepting Walker's offer, since it could have done so for substantially less annual expenditures than the rent to c-N-k. Seldom, if ever, has this Court seen so flagrant and transparent a scheme to "milk the big cow" as this one. There is not a shred of evidence that Lantana was incapable of taking advantage of this corporate opportunity. Nye, Cook and Kamison violated their duty to the plaintiff by appropriating this opportunity to themselves through the device of organizing c-N-k. It only begs the question to say that the purchase by Lantana would not have affected the book value of Lantana's stock as a matter of accounting. It certainly affected the fair market value of Ritter's shares in Lantana.

As a practical legal matter, however, these transactions are of little consequence,

and the conclusion that Nye, Cook and Kamison held their interests in c-N-k subject to a trust in favor of Lantana and Ritter does not change the ultimate conclusions that could be reached in this litigation. It merely makes c-N-k another asset of Lantana which was ultimately acquired by United.

The real legal problem in this case is the meaning and effect of the provisions of Article XI of Lantana's by-laws upon all the facts set forth hereinabove.

The defendants rely upon cases in which a stock repurchase option was for a fixed sum, as such options generally are, although the usual form of the option bases that sum on book value, net asset value, or profits, rather than specifying a fixed dollar amount.

Here, however, Article XI provides that the parties are to agree upon the fair market value of the stock upon an agreed upon date. True, the Article does provide that if the parties cannot agree upon the fair market value, the fair market value shall be either the book value or a multiple of net earnings, whichever is higher. The meaning of "fair market value" is too well established in law to require repeating here. Basic to it is that both parties are fully informed as to what the value really is, and that they are dealing with each other at arms length.

That is not the situation here. Ritter, Nye, Cook and Kamison were shareholders, directors and in the case of Nye, a managing employee, of a closely held corporation. It is elementary in law that each of them owed to the other shareholders the duty of exercising the very highest good faith. The right to rely upon that duty did not die with Ritter, it survived to the plaintiff, his personal representative.

It will not do to say that the defendants exercised the option by their notice of June 7, 1968, and that nothing that happened thereafter made any difference. They did not pretend to know the fair market value of the stock on that date, and arbitrarily selected the par value of the stock as a basis for negotiating. Nor should it be overlooked that much of the real value of Lantana lay in its relationship to Nye, who could hardly be said to be much less valuable in the Summer of 1968 than he was in the Summer of 1969. Nor is there any magic in the June 7th date, as it passed without action, and was, by tacit agreement, extended for almost a year.

What the fair market value of the stock was on that date is not only unknown, it is unimportant. So long as the negotiations continued, the value was an open matter, whether the negotiations were pursued assiduously or desultorily. However, the evidence leaves no doubt whatever that before the defendants forced the conclusion of the negotiations, they knew beyond any question that the fair market value of the shares was far in excess of the book value, somewhere in the neighborhood of thirty times greater, and they concealed that knowledge from the plaintiff. The actions of Nye, Cook and Kamison do not evidence the highest good faith, they show very bad faith indeed.

The disagreement referred to in Article XI of Lantana's by-laws which was to trigger a resort to book value means in law a disagreement in good faith over matters about which reasonable men could honestly have different opinions. It is utterly unreasonable to say that if the plaintiff had known that United had expressed definite interest in acquiring Lantana it would have felt it could not dispute the book-value figure of $14,607.24. At that point, any reasonable man would have known that shares of Lantana were worth far more than book value. The other shareholders thought at that time the shares were worth about three million dollars.

While the actual value of the Ritter shares in Lantana was still an open matter on May 26, 1969, it remained so for less than a month. It is not necessary to guess or speculate about what that value really was. The evidence shows conclusively that it is $422,840.00. The plaintiff is entitled to recover judgment in that amount, less the $15,000.00 previously paid to it.

This conclusion also disposes of the problem of the corporate opportunity wrongfully seized by c-N-k. That transaction was merged into the ultimate purchase by United, so that any profits which should have been realized by Lantana are included in the amount ultimately paid by United.

■ The evidence also establishes quite conclusively that United was aware of the problems with Ritter's interest in Lantana, and made no effort to do anything about it until much too late. The moneys paid by United were impressed with a trust in favor of the plaintiff as Ritter's personal representative, and it was under a duty to see to the application of the funds to the purpose of the trust. It is liable to the plaintiff in the amount of $407,840.00.

Nye, Cook, and Kamison, together with Mrs. Nye and Mrs. Cook, entered into an agreement to indemnify and save harmless United from any losses or damage that it might incur as the result of Ritter's claims. To the extent that United is actually required to pay any of the judgment rendered in favor of the plaintiff, it is entitled to judgment over against the Nyes, the Cooks, and Kamison.

The Court finds that Nye, Cook, and Kamison should not be held jointly liable to the plaintiff for the total amount to which plaintiff is entitled, but each is severally liable for his pro-rata share in proportion to his share of the total purchase price paid by United.

Thus judgment should be rendered against Nye and Mrs. Nye, jointly and severally, in the sum of $259,630.94; Cook and Mrs. Cook, jointly and severally, in the sum of $74,104.53; and against Kamison in the sum of $74,104.53.

■ United claims that plaintiff was guilty of laches in not commencing this action until two years after it first learned of the shady dealings involved in this case. This claim is based upon the fact that United was holding $254,600.00 of the purchase money in escrow, and released these moneys plus accumulated income of the escrow fund to the other defendants in October of 1971. The Court finds against United as to this claim. The problems involved in this case are most complex, and nobody moved very rapidly except for the brief period from April to June, 1969, when serious business was going on. Until at least two years had run, from the time of notice to the plaintiff, United had no reason to suppose that it was safe in paying out the escrow funds. The claim of laches is denied.

The plaintiff bases its claims both on § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, and common law fraud under the laws of Ohio and Florida. Taking Rule 10b–5 literally, it cannot be said to operate in the absence of fraud. It appears to be simply a codification of the common law of fraud and deceit. If no fraud had been practiced on the plaintiff, it could not recover under Rule 10b–5. However, the remedies are perhaps more extensive at common law than under Rule 10b–5. The Court's judgment herein is based both on the Rule and the common law.

The defendants argue, with citations of authority, that common law fraud has not been established in this case. However, their citations deal with fraud in the absence of any fiduciary relationship between the parties. As the Court has previously pointed out, Nye, Cook, and Kamison were not strangers to Ritter, but were in a fiduciary relationship under which they owed him the duty of exercising the very highest good faith. That duty did not die with Ritter, but survived to the plaintiff, his personal representative. Viewed in that context, there can be no shadow of a doubt that the plaintiff was defrauded by Nye, Cook, and Kamison, and by Lantana. Since Lantana merged with United under the law of Florida, Lantana's liability under those laws is imposed upon United.

Under the common law of fraud, both in Ohio and Florida, the Court may grant relief beyond the actual amount out of which the victim was defrauded. There is an equitable duty to make the plaintiff whole, so far as that can be done.

The plaintiff has been compelled to expend money for attorneys fees and the expenses of conducting this litigation. It has also lost the interest which would have been earned by the money had it been paid to the plaintiff when it was due. The plaintiff is entitled to recover interest on the moneys due to it at the rate of six per cent (6%) per annum from August 15, 1969, until the judgment in its favor shall be paid.

Very little evidence was introduced upon the subject of attorneys fees. Plaintiffs' attorneys had a contingent fee agreement with plaintiff, and claim that they are entitled to attorney fees in the amount of $196,420.00. Judgment will be rendered in favor of the plaintiff for its reasonable attorneys fees and expenses in the prosecution of this case, to be apportioned among the defendants upon the same basis as the judgment is apportioned; that is, against United for the full amount thereof, with judgment over in favor of United against the other defendants in such sums as it actually pays to the plaintiff. Nye and Mrs. Nye are subject to judgment in an amount equal to 63.66% of the attorneys fees and expenses; Cook and Mrs. Cook are subject to judgment in an amount equal to 18.17% of said fees and expenses, and Kamison is liable in the same amount as the Cooks. If the parties are unable within a reasonable time to stipulate to the amount to be awarded for attorneys fees and expenses, the Court will set a further hearing to receive evidence upon this matter.

## JUDGMENT

It is Ordered and Adjudged that plaintiff have judgment against the defendants United Brands, Lantana Flower Farms, Inc., and c-N-k Corporation, jointly and severally, in the sum of $407,840.00 plus $75,000.00 for attorney fees and expenses in the prosecution of this action to date, together with interest upon all of said sums at the rate of six percentum (6%) per annum from August 15, 1969 until the same shall be paid; and it is

FURTHER ORDERED that plaintiff have judgment in the alternative as follows:

1. Against the defendants, William N. Nye and Shirley L. Nye, jointly and severally, in the sum of $259,630.94 plus $47,745.00 for attorney fees and expenses in the prosecution of this action to date, together with interest upon all of said sums at the rate of six percentum (6%) per annum from August 15, 1969 until the same shall be paid; and

2. Against the defendants, Pinckney S. Cook and Erma G. Cook, jointly and severally, in the sum of $74,104.53, plus $13,627.50 for attorney fees and expenses in the prosecution of this action to date, together with interest upon all of said sums at the rate of six percentum (6%) per annum from August 15, 1969 until the same shall be paid; and

3. Against the defendant, Jackson Kamison, in the sum of $74,104.53, plus $13,627.50 for attorney fees and expenses in the prosecution of this action to date, together with interest upon all of said sums at the rate of six percentum (6%) per annum from August 15, 1969 until the same shall be paid; and it is

FURTHER ORDERED that the defendant, United Brands Company have judgment against the defendants, William N. Nye, Shirley L. Nye, Pinckney S. Cook, Erma G. Cook, and Jackson Kamison jointly and severally, in an amount equal to any sum or sums that it shall pay to the plaintiff herein, together with interest at the rate of six percentum (6%) per annum from the date or dates of payments by said defendant to the plaintiff; and it is

FURTHER ORDERED that defendant, United Brands Company, have judgment against the defendants William N. Nye, Shirley L. Nye, Pinckney S. Cook, Erma G. Cook and Jackson Kamison, jointly and severally, in the amount of $24,005.23 for its attorney fees and expenses in the defense of this action to date.