**THE TOLEDO TRUST COMPANY, as Executor of the Estate of Henry T. Ritter, Deceased, Plaintiff-Appellee,**

v.

**William N. NYE, Shirley L. Nye, Pinckney S. Cook, Erma G. Cook and Jackson Kamison, Individual Defendants-Appellants,**

**and**

**Lantana Flower Farms, Inc., c-N-k Corporation, and United Brands Company, Corporate Defendants-Appellants.**

**Nos. 77–3189, 77–3190.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 5, 1978.

Decided Dec. 6, 1978.

See also D.C. 392 F. Supp. 484.

Ralph S. Boggs, John H. Boggs, Boggs, Boggs, Boggs & Guthrie, Toledo, Ohio, George E. Allen, Allen, Knudsen, Swartz, DeBoest, Rhodes & Edwards, P.A., Fort Myers, Fla., for appellants in No. 77–3189.

Lee Honberger, Barry L. King, Dyer, Meek, Ruegsegger, King & McClear, Detroit, Mich., Edward F. Weber, Marshall, Melhorn, Bloch & Belt, Toledo, Ohio, for plaintiff-appellee.

Rolf H. Scheider, Shumaker, Loop & Kendrick, Toledo, Ohio, for corporate defendants-appellants.

Ralph S. Boggs, Boggs, Boggs, Boggs & Guthrie, Toledo, Ohio, for individual defendants-appellants.

Before CELEBREZZE and ENGEL, Circuit Judges, and LAWRENCE,* Senior District Judge.

CELEBREZZE, Circuit Judge.

Plaintiff brought this action in the district court alleging violation of § 10(b) of the Securities Exchange Act of 1934[1] and Securities and Exchange Commission Rule 10b–5[2] and several common law claims. The case hinges on the legal effect of a stock option contained in a corporation's by-laws allowing the corporation to purchase the stock of a deceased shareholder. All of the numerous individual and corporate defendants appeal from a total judgment of roughly $500,000 entered against them after a bench trial. They contend that the facts developed below support neither the federal nor state claims for relief asserted by plaintiff. We agree and reverse.

Henry T. Ritter was a minority shareholder in Lantana Flower Farms, Inc. (Lantana), a closely-held Florida corporation engaged in the commercial flower business in Florida. At the time of his death on May 17, 1968, Ritter owner 143 of the 930 outstanding shares of common stock of Lantana. Article XI of Lantana's by-laws, which provision is the crux of this litigation, restricted the transfer of the corporation's stock.[3] Article XI is a variation on a typical theme for closely-held corporations and gave Lantana an option to purchase all of the shares of a deceased shareholder, exercisable for thirty days after death. (Article XI, Section 2(a)(iii) & (b) & (c).) It also provided that the price of any shares so purchased was to be their "fair market value . . . as of the end of the month immediately preceding the exercise of the option. . . ." "Fair market value," however, was artificially defined as either (a) any price the parties could agree upon or

---

* The Honorable Alexander A. Lawrence, Senior United States District Judge, Southern District of Georgia, sitting by designation.

1. 15 U.S.C. § 78j(b).

2. 17 C.F.R. § 240.10b–5.

3. Article XI is set forth as an appendix to this opinion.

(b) failing agreement, the higher of (i) "the book value of such shares as shown on the balance sheet of the corporation" or (ii) ten times the average per share earnings of such shares over the last three fiscal years. (Article XI, Section 2(e).)

On June 7, 1968, Lantana timely exercised its option to purchase Ritter's 143 shares.[4] The letter exercising the option stated that the "corporation believes the fair market value of said shares to be $50.00 each, or a total of $7,150.00 for all 143 shares."[5] It was proposed that the shares be transferred on June 14, 1968. Plaintiff, the executor of Ritter's estate, requested an extension of time, which was approved by Lantana's president and counsel. Plaintiff also requested and later received Lantana's financial statement as of June 30, 1968, its fiscal year end. No other significant progress was made toward resolution of this matter until April 1969.

In the meantime, in December 1968, two representatives of United Fruit Company[6] visited Lantana's operations and talked with its president, defendant William Nye.[7] The United representatives did not identify themselves as such and were known to Nye only as friends of an acquaintance of Nye. The United people contacted Nye again in March 1969 and this time fully identified themselves and their purpose, which was to investigate Lantana as a possible candidate for United to take over in order to get into the commercial flower business.

In early April 1969, Nye and Lantana's counsel made a new offer to plaintiff for the purchase of Ritter's shares. They offered $88.27 per share, for a total of $12,622.61, which they thought to approximate the "fair market value," viz., book value as set forth in Article XI.[8] This offer was not accepted by plaintiff, which sought further financial data on Lantana. Later in April, after Lantana's accountants had formally calculated the book value of the shares, another offer was made which reflected these new calculations. It amounted to a total of $14,607.24, or about $102.15 per share.[9] The letter transmitting this offer to plaintiff advised that if it were not accepted within fifteen days Lantana would deposit the total sum in a Florida bank, with instructions to pay it to plaintiff upon receipt of Ritter's stock certificates, and cancel the certificates on the books of the corporation, as provided in the by-laws. (Article XI, Section 2(f).) Both of these actions were taken by Lantana in mid-May 1969.

At some point during these negotiations, Nye told one of plaintiff's trust officers by telephone that Lantana would round the $14,607.24 up to an even $15,000 (about $104.90 per share), which he said was "more than fair," in order to settle the matter. Advised by counsel that Lantana would prevail in an action to compel sale of the shares, plaintiff accepted the $15,000 offer

---

4. The option exercise was initially sent by Lantana, acting through its president, to Ritter's widow. She forwarded it to plaintiff, the executor of Ritter's estate, on about June 14, 1968. Plaintiff argued before the district court that Lantana did not properly exercise the option, that Lantana waived its rights by not closing the share transfer within thirty days, and that the restriction was not enforceable because it was not endorsed on the stock certificates. The district court held that plaintiff was estopped from denying the validity of the option exercise due to its acquiescence in it and failure to timely raise these issues. 392 F.Supp. 484, 488 (N.D.Ohio 1975). Plaintiff has not challenged this holding on appeal (but cf. note 18, infra); thus we must assume, without deciding, that the option was properly exercised in all regards and enforceable against plaintiff.

5. The $50 figure was chosen by Lantana's counsel since it was the par value of the shares and he had no current financial statement available.

6. United Fruit Company subsequently changed its name to United Brands Company and will hereinafter be referred to as "United."

7. There is no suggestion that there was any contact between United and Lantana before December 1968.

8. The alternate valuation method of ten times the average per share earnings over the last three years came to a much lower figure and was never considered in the negotiations.

9. Plaintiff does not seriously dispute that this figure reflects book value as set forth in Article XI.

in late May and sent the stock certificates to the Florida bank, which in turn sent the $15,000 to plaintiff in early June 1969.

Also in late May 1969, United began serious negotiations for the takeover of Lantana. At an early June Lantana shareholders' meeting it was decided by all the remaining shareholders that the sale price would have to be in the "neighborhood of" $3,000,000. By late June 1969 it was agreed to sell all outstanding Lantana stock to United for $2,600,000, plus a $150,000 bonus if Nye could double its production in a year. United also signed Nye to a long-term contract. After an audit of Lantana, the sale was closed in August 1969.[10] The per share price received from United by the remaining shareholders of Lantana was roughly thirty times the per share price Lantana had paid plaintiff for Ritter's shares a few months earlier.

The record does not reveal that any representative of plaintiff had any knowledge of Lantana's dealings with United until well after the sale of stock. There was no disclosure of any of these developments by anyone connected with Lantana or United. Plaintiff eventually learned what happened in August 1970, however, and filed this action in August 1972. Joined as defendants were Nye and his wife Shirley L. Nye, Pinckney S. Cook and his wife Erma G. Cook, and Jackson Kamison, who were all the shareholders of Lantana other than Ritter, and Lantana and United.[11]

After extensive discovery, the district court ruled, in pertinent part, that before his death Ritter had not been coerced into transferring some shares to Nye, that plaintiff was estopped to deny the validity of the exercise of the option by Lantana, that summary judgment was not appropriate on

plaintiff's § 10(b) and Rule 10b–5 claims, and that those claims were not barred by the statute of limitations.[12] 392 F.Supp. 484 (N.D.Ohio 1975). None of these determinations are contested in this appeal and we have no occasion to rule on them here.[13]

The district court then heard evidence in a three day bench trial. The court found for plaintiff and entered judgment in its favor in the amount of $407,840, plus $75,000 for attorneys fees and expenses, plus interest on both sums from August 1969. 426 F.Supp. 908 (N.D.Ohio 1977). The main thrust of the district court's opinion was that, while Article XI gave Lantana an option to purchase Ritter's shares, Lantana extended the time to close the transaction until June 1969 (when the $15,000 was sent to plaintiff) and the defendants had a duty to disclose to plaintiff all the information that they had through that date concerning the United takeover. The court found complete nondisclosure by all defendants, characterized as "very bad faith indeed," id. at 913, which caused plaintiff to transfer Ritter's shares for $15,000 when they were really worth $422,840.[14] The district court based its holding on "both . . . Rule [10b–5] and the common law" and apparently found both fraud and breach of fiduciary duty in addition to federal securities law violations. Id. at 914.

The district court ignored the provision of Article XI that established the valuation date for the shares purchased as "the end of the month immediately preceding the exercise of the option," which was May 31, 1968. The court said "it will not do to say that defendants exercised the option by their notice of June 7, 1968, and that nothing that happened thereafter made any differ-

---

10. Lantana was merged into United in November 1970.

11. Another defendant was c-N-k Corporation. *See* note 27, *infra.*

12. The district court ruled that Ohio's four year statute of limitations applicable to fraud applied to actions brought under § 10(b) and Rule 10b–5. This court subsequently reached the same result in *Nickels v. Koehler Management Corp.,* 541 F.2d 611 (6th Cir. 1976), *cert. den.*

429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). *See also Gaudin v. KDI Corp.,* 576 F.2d 708, 711–12 (6th Cir. 1978).

13. *But cf.* note 12, *supra* ; and *cf.* note 4, *supra.*

14. Subtracting the $15,000 received from the perceived $422,840 value of the shares, the district court arrived at the judgment amount of $407,840.

ence." *Id.* at 913. The court never fully explained why this would "not do." It also noted but apparently ignored the artificial definition of "fair market value" expressly delineated in Article XI, saying that "the meaning of 'fair market value' is too well established in law to require repeating here." *Id.*

The critical issue presented on appeal is whether the largely undisputed facts set forth above give rise to liability under § 10(b) and Rule 10b–5. We hold that they do not.

The analysis in this case must begin by focusing on Article XI of Lantana's by-laws. Initially, we note that the validity of Article XI is not called into question here.[15] Plaintiff has not contended to this court that Article XI did not impose an enforceable contractual obligation as a matter of state law.[16] We are thus presented with an enforceable stock restriction which gave Lantana an option, timely exercised, to purchase Ritter's shares at their book value as of May 31, 1968.[17]

■ There can be no liability under § 10(b) and Rule 10b–5 arising from the implementation of these valid contractual rights. An essential element for any § 10(b)/Rule 10b–5 claim for relief is *materiality*—there can be no liability in the absence of misrepresentation or nondisclosure of a material fact. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 150–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Arber v. Essex Wire Corp.*, 490 F.2d 414, 418 (6th Cir.), *cert. den.* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974). *See also Aquionics Acceptance Corp. v. Kollar*, 536 F.2d 712, 714 (6th Cir. 1976); *Chelsea Associates v. Rapanos*, 527 F.2d 1266, 1270 (6th Cir. 1975). The nondisclosed information in this cause, regarding the United negotiations and the high price United was willing to pay for Lantana's stock, could not have been material to plaintiff. It was contractually bound to sell Ritter's shares to Lantana at an established price as of a certain date, which date was long before the nondisclosed information even existed.

■ While Article XI permitted the parties to reach a mutually agreeable price without resorting to the formula provided therein, that merely stated the truism that parties to a binding contract of sale can mutually agree to sale terms different than those set forth in the contract. The negotiations that ultimately took place here were designed only to insure that the book value formula price was accurately determined. There is no merit to plaintiff's assertion that Nye's rounding the $14,607.24 figure up to $15,000 meant the parties were not using the book value method to determine the stock's price.[18] And even if they were operating under the permissive negotiation provision, that clause also focused on the stock's value as of May 31, 1968. Since the first contact with United was not until over six months after that date, disclosure of the United negotiations would still be irrelevant to determination of "fair market value" as of May 31, 1968. The district court focused too much on the essentially mean-

---

15. *See* note 4, *supra* (regarding the validity of Lantana's exercise of the option) and note 18, *infra* (regarding any possible waiver of Lantana's option rights).

16. A determination of the validity of the stock restriction would initially require a resolution of the conflicts of laws question of applicable state law. Since Lantana was a Florida corporation doing business in Florida, all relevant events appear to have occurred in Florida and the only apparent contact with Ohio was Ritter's residence there, Florida law would probably apply.

   *See St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1044–47 (8th Cir. 1977), *cert. den.* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978), upholding the enforceability of a similar stock restriction under Delaware law, and *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444, 446–47 (2d. Cir. 1971), *cert. den.* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972), upholding enforceability under New York law.

17. An entirely different case would be presented if, for some reason, the stock restriction were not enforceable. *See Holmes v. Bateson*, 583 F.2d 542, 556–57 (1st Cir. 1978).

18. There is also no factual or legal support for plaintiff's contentions that Lantana waived its right to rely on Article XI's price formula or exercised the option for an improper purpose.

ingless provision permitting the parties to reach an independently negotiated price rather than on the plain language of Article XI which said that in the absence of such agreement the price was to be mechanically set at the higher of book value or ten times the average per share earnings, as of May 31, 1968. Given the enforceability of the option, the nondisclosed information was simply not material in determining the price of the shares.[19]

The eighth circuit has recently reached the same result on very similar facts. *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040 (8th Cir. 1977), *cert. den.* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978).[20] *St. Louis Union* concerned an option held by Merrill Lynch to purchase its stock at "adjusted net book value" upon the death of a shareholder-employee. The shareholder died in 1970 and Merrill Lynch timely exercised its option at the established price. Shortly thereafter Merrill Lynch went public and offered its stock to the public at a price approximately three times that paid to the deceased shareholder's estate. The decedent's estate brought suit based upon the failure of Merrill Lynch to disclose its plan to go public at the time it purchased the decedent's stock.

The eighth circuit, after finding the stock restriction enforceable under the relevant state law (Delaware), held that the estate could not recover for this nondisclosure. The court noted that causation in fact is an essential element for recovery under § 10(b) and Rule 10b–5. It stated that causation has been analyzed both in terms of materi-

ality and reliance, *id.* at 1048, but the result was the same there under either mode of analysis, *id.* at 1049. Any "loss" was not caused by a material omission but was caused by an enforceable, timely exercised stock restriction triggered by the shareholder's death. *Id.*

Whatever the . . . executors knew or did not know about a future public offering of Merrill Lynch stock was wholly irrelevant to their decision to sell the stock. After [the shareholder] died . . . the decision to sell was out of their hands; they were contractually bound to sell under Article VI, Section 1(a) of the Merrill Lynch Certificate of Incorporation if Merrill Lynch exercised its option. Any information concerning the public offering was not "material" in the sense that a reasonable or objective investor, in the plaintiffs' circumstances, would likely have considered it important in making his decision to sell. Likewise, in reliance terms, any information concerning the public offering could not have subjectively influenced the plaintiffs to act differently than they did act in selling the shares to the corporation pursuant to the terms of the stock restriction. The defendants were thus under no obligation—and had no federal "duty" under § 10(b) and Rule 10b–5—to disclose any information to the plaintiffs concerning the public offering when the stock restriction was enforced.

*Id.* at 1049–50 (footnotes omitted).

We agree with the above analysis and we find it dispositive here.[21]

---

**19.** The fact that the shares were not actually transferred until approximately one year after Ritter's death is of no particular importance since the price was always to be determined as of May 31, 1968. Part, if not most, of the delay was caused by plaintiff in any event. *See* note 4, *supra*, and accompanying text.

**20.** *St. Louis Union* was followed on essentially identical facts in *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 450 F.Supp. 639 (S.D.N.Y.1978).

**21.** Of the two modes of analysis—materiality and reliance—materiality is preferable since the Supreme Court has stated that in nondis-

closure cases, as this one purports to be, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material. . . ." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). The "obligation to disclose and [the] withholding of a material fact establish the requisite element of causation in fact." *Id.* at 154, 92 S.Ct. at 1472. Thus, in the instant case, if the nondisclosed information were material, "positive proof of reliance [would not be] a prerequisite to recovery."

The second circuit has also employed similar reasoning in disposing of several analogous cases. In *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972), the court said that a "party does not, within the intendment of Rule 10b–5, use material inside information unfairly when he fulfills contractual commitments which were incurred by him previous to his acquisition of that information. . . ." In *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444 (2d Cir. 1971), *cert. den.* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972), a shareholder-employee's stock was purchased by the corporation pursuant to a valid stock restriction upon his mandatory retirement. The shareholder brought a § 10(b)/Rule 10b–5 action alleging nondisclosure of a pending public offering of the corporation's stock. The court held that, since the shareholder was obligated to sell his shares as of a certain date at an established price, whatever he knew or did not know about the planned public offering was irrelevant. In *Fershtman v. Schectman*, 450 F.2d 1357 (2d Cir. 1971), *cert. den.* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972), recovery was denied to limited partners whose partnership interests were bought by the general partners pursuant to a valid contractual agreement which gave the general partners power to do so at their sole discretion.

The common element of *St. Louis Union* and these second circuit cases is that the plaintiffs had no control over the event which triggered the right of the defendants to buy the stock pursuant to a valid contractual commitment. That element is similarly present in this cause in the form of Ritter's death triggering the stock option. *See also Dopp v. Franklin National Bank*, 461 F.2d 873, 880 n. 16 (2d Cir. 1972); *Bank*

*v. Fleisher*, 419 F.Supp. 1243 (D.Neb.1976); *Goodman v. Poland*, 395 F.Supp. 660, 690 (D.Md.1975); *Blackett v. Clinton E. Frank, Inc.*, 379 F.Supp. 941 (N.D.Ill.1974).

*Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 538 F.2d 532 (3d Cir.), *cert. den.* 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976), on the other hand, involved a plaintiff who had more control over his destiny. In *Ayres*, yet another disgruntled Merrill Lynch shareholder-employee had his shares purchased by the corporation just before it went public with the corresponding increase in the value of the stock. The complaint,[22] however, alleged that the plaintiff voluntarily decided to retire which amounted to a voluntary decision to sell his stock since he knew that Merrill Lynch would exercise its option upon his retirement. The third circuit found this to be a distinguishing factor from the second circuit's decision in *Ryan*.

The dissent in *Ayres* felt that these factual allegations did not state a federal claim for relief. *Id.* at 539–40. It emphasized that Merrill Lynch had an unconditional right to exercise its option to purchase the plaintiff's shares upon ninety days' notice and he had no right to refuse to sell.[23] It contended that the only decision the plaintiff made was whether or not to retire, not whether or not to sell his stock, and thus the case was controlled by *Ryan*.

Plaintiff's reliance upon *Ayres* is misplaced. *Ayres* is distinguishable from this cause inasmuch as the plaintiff in *Ayres* had at least some control over the course of events that led to the sale of his stock. We express no opinion, therefore, on the correctness of the decision in *Ayres*. Both the majority and dissent there made reasonable arguments and we leave resolution in this

See *Chelsea Associates v. Rapanos, supra*, 527 F.2d at 1271–72 & n. 2; *Arber v. Essex Wire Corp., supra*, 490 F.2d at 421 n. 7.

**22.** The district court in *Ayres* had ordered arbitration of the dispute, which the third circuit found inappropriate, so that only the allegations of the complaint were before the court. The case was remanded for further proceedings.

**23.** This unconditional characterization of the Merrill Lynch option differs from the Merrill Lynch option which was described in *St. Louis Union* as dependent upon "the occurrence of several specified contingencies." *Compare* 538 F.2d at 533 & 539 *with* 562 F.2d at 1043.

circuit of that different case for another day.[24]

■ As noted earlier, plaintiff has not challenged the legality or enforceability of the stock restriction in Article XI under state law.[25] As to plaintiff's common law claims, then, it is in the completely untenable position of arguing that the defendants are liable for either fraud or breach of fiduciary duty when they merely acted pursuant to a presumptively valid contractual commitment under the relevant state law.[26] Plaintiff has cited no authority, and our research discloses none, which would support a common law claim for relief on the facts of this case.[27] To the extent the judgment below rested upon the common law, it was erroneous and must be reversed.[28] *See St. Louis Union, supra,* 562 F.2d at 1054–55 (no fraud or breach of fiduciary duty claim under Missouri or Delaware law, respectively); *Arber, supra,* 490 F.2d at 421 (neither Michigan nor Indiana law on fraud is any broader than law under § 10(b)).

Further considerations also weigh against recovery on the facts of this case. The use of stock restrictions such as Article XI of Lantana's by-laws is widespread among closely-held corporations. If we were to hold that enforcement of such options gave rise to liability under § 10(b) and Rule 10b–5, it would have far-reaching consequences beyond the intendment of the federal securities laws. Whether or not such stock options are "fair" or wise as a policy matter is a question of state law which is beyond the power of this court to determine. *See Santa Fe Ind. v. Green,* 430 U.S. 462, 478–80, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). We would be extremely hesitant to interfere in a matter of state corporate regulation in the absence of a clear Congressional mandate. *Id.* at 479, 97 S.Ct. 1292.

As they currently stand, § 10(b) and Rule 10b–5 are primarily designed to grant relief from acts which can be characterized as "manipulative" or "deceptive." *Santa Fe Ind., supra,* 430 U.S. at 473–77, 97 S.Ct. 1292; *Ernst & Ernst v. Hochfelder* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The actions of the defendants in the instant case do not come within those terms of art.

This case essentially involves the enforceability of an option contract. The typical purpose of an option is to give one an opportunity to purchase an item at a set price at some future time. This necessarily also obligates the other party to the contract to sell the item on the same terms, regardless of what terms he could negotiate with another party at some other time. Thus, plaintiff was obligated by the option contract entered into by Ritter and was not entitled to share in what was admittedly a

---

**24.** The court in *St. Louis Union* also distinguished *Ayres* for essentially the same reasons we have stated here. 562 F.2d at 1053–54. The court went on, however, to indicate "serious doubts about the correctness of the majority's disposition in *Ayres.*" *Id.* at 1053 n. 18. Inasmuch as we do not express any opinion on the correctness of *Ayres,* we do not join in this thinly veiled criticism.

**25.** *See* text accompanying notes 15–17, *supra.*

**26.** As to its breach of fiduciary duty claim, plaintiff's brief in this court does not bother to mention whether Ohio or Florida law applies. As to its fraud claim, its brief argues that fraud was established under both Ohio and Florida law. This is typical of litigants' desires to avoid conflicts of laws questions. *See* note 16, *supra.*

**27.** Another common law claim made by plaintiff is that several of the individual defendants were liable for wrongful appropriation of a corporate opportunity of Lantana when, well after the exercise of the option to buy Ritter's shares, they formed c-N-k Corporation solely for the purpose of buying a parcel of realty in Florida and leasing it to Lantana. This claim is, at best, a red herring. Even under the district court's disposition of the case, which found that plaintiff had made out a wrongful appropriation claim, this issue made no difference in the calculation of damages. 426 F.Supp. at 912–13. Under our disposition of the case, the claim is equally irrelevant since the price to which plaintiff was entitled for Ritter's stock was established as of May 31, 1968, and what happened afterwards made no difference.

**28.** The award of attorney fees (and expenses and interest), of course, also must fall whether it was based upon federal or state law.

windfall profit received by the individual defendants. While it appears, in retrospect, that Ritter made a bad bargain, it is not the function of the federal courts to relieve him of that responsibility. It may be that the fortuity of Ritter's death arbitrarily cut him (or his estate) out of a considerable sum of money, but that is the agreement he made and there is no federal policy against enforcement of it.

The judgment of the district court is reversed and the cause is remanded to that court with instructions to dismiss the complaint.

## APPENDIX

## ARTICLE XI

### Restrictions on Transfer of Shares

*Section 1. Restrictions on Transfer of Shares.* No shares of this corporation shall be transferred on the books of this corporation until the person desiring such transfer shall have complied with the provisions of this Article.

*Section 2. Corporation's Option to Repurchase Shares.*

(a) *When Option Arises.* The corporation shall have the exclusive right and option to repurchase shares held by any shareholder in the amounts and for the period hereinafter stated upon the occurrence of any one or more of the following events:

(i) (Sale or other disposition) The receipt by the corporation of written notice from said shareholder, his heirs or personal representative, of intention to sell, exchange or make any other disposition of any of his shares in the corporation. The term "other disposition" shall not include a gift of such shares made either directly to, or to another person for the benefit of, such shareholder's spouse or his lineal descendants;

(ii) (Attempted transfer) The presentation of any of such shareholder's certificates for shares to this corporation, for transfer to any other person or persons, or any firm, corporation or other organization without compliance with the provisions of this Article; provided that such presentation for transfer is not for the purpose of consummating a gift of the type permitted in Section 2(a)(i) above; or

(iii) (Death) The receipt of written notice from any interested person of the death of the holder of said shares.

(b) *Number of Shares.* If the option arises by virtue of an intended sale or other disposition or by an attempt to transfer shares without compliance with this Article, the corporation's option shall relate only to the number of shares specified in the shareholder's notice or to the number of shares represented by certificates presented for transfer. If the option arises by virtue of the death of the shareholder, the option shall relate to all shares of the corporation owned of record by such shareholder or which he then had a right to acquire.

(c) *Term of Option.* The corporation shall have the right to exercise such option for a period of thirty (30) days from the date of the happening of the first of said events to occur.

(d) *Exercise of Option.* The corporation's option to purchase shall be exercised by written notice to the shareholder, heir, personal representative or other holder of such shares, delivered in person or sent by registered or certified mail to his address as shown on the corporation's books and records or as furnished to the corporation by such person. Such notice shall specify the number of shares and the amount per share believed by the corporation to be the fair market value of the shares (and thus the purchase price of such shares) not later than ten (10) days from the date of such notice, when and place where it proposes to close the transaction. Notice of exercise, if mailed, shall be deemed to have been given when it is deposited, postage prepaid, in the mail.

(e) *Price.* The price to be paid upon the purchase of such shares shall be an amount per share equal to the fair mar-

ket value of such shares as of the end of the month immediately preceding the exercise of the option by the corporation. As used herein, the term "fair market value" as applied to the corporation's shares shall mean either (a) the value agreed upon by the corporation and the shareholder whose shares are to be purchased, in which case the closing shall be held at the time and place specified in the corporation's notice unless otherwise agreed upon by the parties, or (b) if they are unable to agree upon such value by the time of closing specified in the corporation's notice of exercise, the fair market value of the shares shall be the higher of (i) the book value of such shares as shown on the balance sheet of the corporation prepared as of such time by the corporation's public accountants in conformity with generally accepted accounting principles applied on a basis consistent with that employed in the preparation of the corporation's balance sheet prepared as of the close of the corporation's last fiscal year, or (ii) the value determined by multiplying by a factor of ten (10) the average earnings per common shares of the corporation for the last three fiscal years which have expired since the fiscal year ended June 30, 1966 (or if three whole fiscal years have not expired since the end of such fiscal year then the average of such whole number of fiscal years as shall have expired since such time). The term "earnings per share" shall mean the corporation's earnings per share determined by the corporation's public accountants in accordance with generally accepted accounting principles applied on a consistent basis during the periods involved.

(f) *Payment.* The corporation shall pay for the shares in cash at the time and place of closing upon the receipt of the appropriate certificates for shares duly endorsed in blank for transfer with all federal stock transfer taxes prepaid by the seller. If the shareholder or other person from whom the shares are to be repurchased fails to deliver the required

certificates for shares at the specified time and place of closing, the corporation may deposit the purchase price in any bank or trust company in Ft. Lauderdale or West Palm Beach, Florida, in a special account with instructions to pay the same to such shareholder or other person upon receipt of the proper certificates for the corporation's shares duly endorsed in blank for transfer. From and after the date of such deposit, all rights and interest of such person, and all persons claiming by, through and under him, in and to such shares, shall cease and he or they shall cease to be a shareholder and have no further rights other than to receive the purchase price without interest; and the corporation shall thereafter cancel such certificate or certificates on its books.

*Section 3. Shareholders' Options.* [This section gave the shareholders an option to purchase shares not purchased by the corporation.]

*Section 4. Effect of Waiver or Failure to Exercise Options.* [This section dealt with the consequences of the waiver of or failure to exercise an option by either the corporation or the remaining shareholders.]