James S. JORDAN, Plaintiff-Appellant, Cross-Appellee,

v.

DUFF AND PHELPS, INC., Claire V. Hansen, and Francis E. Jeffries, Defendants-Appellees, Cross-Appellants.

Nos. 86–1611, 86–1727.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 1987.

Decided March 17, 1987.

Rehearing and Rehearing En Banc Denied April 28, 1987.

Cudahy, Circuit Judge, concurred and filed opinion.

Posner, Circuit Judge, dissented and filed opinion.

Thomas P. Ward, Thomas P. Ward, Ltd., Chicago, Ill., for plaintiff-appellant, cross-appellee.

Edward Fitzpatrick, Lord, Bissell & Brook, Chicago, Ill., for defendants-appellees, cross-appellants.

Before CUDAHY, POSNER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

*Flamm v. Eberstadt*, 814 F.2d 1169 (7th Cir.1987), holds that a corporation need not disclose, to investors trading in the stock market, ongoing negotiations for a merger. A public corporation may keep silent until the firms reach agreement in principle on the price and structure of the deal. See also, e.g., *Staffin v. Greenberg*, 672 F.2d 1196, 1204–07 (3d Cir. 1982); *Reiss v. Pan American World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir.1983). Things are otherwise for closely held corporations. *Michaels v. Michaels*, 767 F.2d 1185, 1194–97 (7th Cir. 1985), holds that a closely held firm must disclose material information to investors from whom it purchases stock, and that a decision to seek another firm with which to merge may be the sort of material information that must be disclosed to the investor selling his shares, even though the firm has not reached agreement in principle on the price and structure of a deal. See also *Kohler v. Kohler Co.*, 319 F.2d 634, 637–38 (7th Cir.1963).

The treatment of public and private corporations is different because of the potential effects of disclosure. Often negotiations must be conducted in secrecy to increase their prospects of success. See *Flamm*, 814 F.2d at 1175–77. The prospect of disclosure to the public, and therefore to potential rival bidders, may reduce the willingness of some firms to enter negotiations and lead others to cut back on the best price they will offer. Investors are entitled to the benefits of secrecy during the nego-

tiations; a law designed to prevent frauds on investors tolerates silence that yields benefits for investors as a group. *Flamm* also points out that negotiating firms need to know when they must disclose. Uncertainty may lead to premature disclosures that investors would like to avoid. A close corporation may disclose to an investor without alerting the public at large, however, so that disclosure does not injure investors as a whole. Moreover, a rule that the close corporation (or its managers) must disclose in the course of negotiating to purchase stock supplies a timing rule on which the firm may rely. It need disclose the existence of the decision to sell (and the status of negotiations) only to the person whose stock is to be acquired. The face-to-face negotiations allow the investor to elicit the information he requires, see *Michaels*, 767 F.2d at 1196, and *Hamilton v. Harrington*, 807 F.2d 102, 106–07 & n. 5 (7th Cir.1986), while permitting the firm to extract promises of confidentiality that safeguard the negotiations.

This case contains two wrinkles. First, it involves the acquisition of a closely held corporation by a public corporation. Second, the investor in the closely held corporation was an employee, and he was offered shares to cement his loyalty to the firm; yet he quit (and was compelled by a shareholders' agreement to sell his shares) for reasons unrelated to the value of the stock. The parties hotly contest the effects of these facts.

### I

The case is here following a grant of summary judgment for the defendants. Judge Hart denied one motion for summary judgment and told the parties to address in their trial briefs the defendants' second motion. Judge Leinenweber, to whom the case was reassigned, then granted this motion shortly before the trial. The materials that were identified in plaintiff's trial brief and the pretrial order, taken with reasonable inferences in the light favorable to him, support the following tale.

Duff and Phelps, Inc., evaluates the risk and worth of firms and their securities. It sells credit ratings, investment research, and financial consulting services to both the firms under scrutiny and potential investors in them. Jordan started work at Duff & Phelps in May 1977 and was viewed as a successful securities analyst. In 1981 the firm offered Jordan the opportunity to buy some stock. By November 1983 Jordan had purchased 188 of the 20,100 shares outstanding. He was making installment payments on another 62 shares. Forty people other than Jordan held stock in Duff & Phelps.

Jordan purchased his stock at its "book value" (the accounting net worth of Duff & Phelps, divided by the number of shares outstanding). Before selling him any stock, Duff & Phelps required Jordan to sign a "Stock Restriction and Purchase Agreement" (the Agreement). This provided in part:

> Upon the termination of any employment with the Corporation ... for any reason, including resignation, discharge, death, disability or retirement, the individual whose employment is terminated or his estate shall sell to the Corporation, and the Corporation shall buy, all Shares of the Corporation then owned by such individual or his estate. The price to be paid for such Shares shall be equal to the adjusted book value (as hereinafter defined) of the Shares on the December 31 which coincides with, or immediately precedes, the date of termination of such individual's employment.

Duff & Phelps enforced this restriction with but a single exception. During 1983 the board of directors of Duff & Phelps adopted a resolution—of which Jordan did not learn until 1984—allowing employees fired by the firm to keep their stock for five years. The resolution followed the discharge of Carol Franchik, with whom Claire Hansen, the (married) chairman of the board, had been having an affair. When Franchik threatened suit, the board allowed her to keep her stock.

While Jordan was accumulating stock, Hansen, the chairman of the board, was exploring the possibility of selling the firm. Between May and August 1983 Hansen and Francis Jeffries, another officer of Duff & Phelps, negotiated with Security Pacific Corp., a bank holding company. The negotiators reached agreement on a merger, in which Duff & Phelps would be valued at $50 million, but a higher official within Security Pacific vetoed the deal on August 11, 1983. As of that date, Duff & Phelps had no irons in the fire.

Jordan, however, was conducting a search of his own—for a new job. Jordan's family lived near Chicago, the headquarters of Duff & Phelps, and Jordan's wife did not get along with Jordan's mother. The strain between the two occasionally left his wife in tears. He asked Duff & Phelps about the possibility of a transfer to the firm's only branch office, in Cleveland, but the firm did not need Jordan's services there. Concluding that it was time to choose between his job and his wife, Jordan chose his wife and started looking for employment far away from Chicago. His search took him to Houston, where Underwood Neuhaus & Co., a broker-dealer in securities, offered him a job at a salary ($110,000 per year) substantially greater than his compensation ($67,000) at Duff & Phelps. Jordan took the offer on the spot during an interview in Houston, but Underwood would have allowed Jordan to withdraw this oral acceptance.

On November 16, 1983, Jordan told Hansen that he was going to resign and accept employment with Underwood. Jordan did not ask Hansen about potential mergers; Hansen did not volunteer anything. Jordan delivered a letter of resignation, which Duff & Phelps accepted the same day. By mutual agreement, Jordan worked the rest of the year for Duff & Phelps even though his loyalties had shifted. He did this so that he could receive the book value of the stock as of December 31, 1983—for under the Agreement a departure in November would have meant valuation as of December 31, 1982. Jordan delivered his certificates on December 30, 1983, and the firm mailed him a check for $23,225, the book value (at $123.54 per share) of the 188 shares of stock. Jordan surrendered, as

worthless under the circumstances, the right to buy the remaining 62 shares.

Before Jordan cashed the check, however, he was startled by the announcement on January 10, 1984, of a merger between Duff & Phelps and a subsidiary of Security Pacific. Under the terms of the merger Duff & Phelps would be valued at $50 million. If Jordan had been an employee on January 10, had quickly paid for the other 62 shares, and the merger had closed that day, he would have received $452,000 in cash and the opportunity to obtain as much as $194,000 more in "earn out" (a percentage of Duff & Phelps's profits to be paid to the former investors—an arrangement that keeps the employees' interest in the firm keen and reduces the buyer's risk if profits fall short). Jordan refused to cash the check and demanded his stock back; Duff & Phelps told him to get lost. He filed this suit in March 1984, asking for damages measured by the value his stock would have had under the terms of the acquisition.

The public announcement on January 10 explained that the boards of the two firms had reached an agreement in principle on January 6. The definitive agreement was signed on March 23. Because Security Pacific is a bank holding company, the acquisition required the approval of the Board of Governors of the Federal Reserve. The Fed granted approval, but with a condition so onerous that the firms abandoned the transaction. The Fed objected to Security Pacific's acquisition of Duff & Phelps's credit rating business. 71 Fed.Res.Bull. 118 (1985). The agreement was formally cancelled on January 9, 1985. Duff & Phelps quickly asked the district court to dismiss Jordan's suit, on the ground that he could not establish damages. Jordan responded by amending his complaint, with Judge Hart's permission, to ask for rescission rather than damages.

Throughout 1985 Duff & Phelps continued looking for a partner; finding none, it decided to dance with itself. The firm's management formed an "Employee Stock Ownership Trust", which was able to borrow $40 million against the security of the firm's assets and business. The Trust acquired Duff & Phelps through a new firm, Duff Research, Inc. This transaction occurred in December 1985. The employees at the time, together with Carol Franchik, received cash, notes, and beneficial interests in the Trust. Jordan asserts that the package was worth almost $2000 per share, or $497,000 if he had held 250 shares in December 1985.

Defendants' second motion for summary judgment maintained that information about negotiations looking toward a merger is immaterial as a matter of law. The information Jordan says should have been disclosed before he departed includes: (1) the negotiations through August 11, 1983, with Security Pacific; (2) the decision by the board of Duff & Phelps on November 14, 1983, to seek bids for the firm; (3) miscellaneous conversations between Hansen and employees of Security Pacific during the fall of 1983, which Jordan says may have been renewed overtures; (4) the serious negotiations during December 1983 between Duff & Phelps and Security Pacific, after the manager who nixed the deal on August 11 changed his mind; (5) the board's decision to allow Franchik to keep her stock; and (6) the formal settlement agreement signed by Franchik on December 21, 1983. Duff & Phelps, on the other hand, believes that Jordan quit on November 16, 1983, that nothing after that date matters, and that nothing before that date needed to be revealed.

Judge Leinenweber concluded that the agreement in principle approved on January 6, 1984, was the first thing that needed to be disclosed. Because Jordan sold his stock no later than December 31, Duff & Phelps did not violate any duty to disclose. *Jordan v. Duff & Phelps, Inc.*, Fed.Sec.L. Rep. (CCH) ¶ 92,724 (N.D.Ill.1986). The court followed the holding of Judge Shadur in *Guy v. Duff & Phelps, Inc.*, 628 F.Supp. 252 (N.D.Ill.1985), that because Security Pacific is a public corporation, the governing approach is the price-and-structure rule of *Staffin*, rather than the different approach *Michaels* applies to close corporations. The court stated: "When at least one of the parties to acquisition negotia-

tions is a publicly-traded company, an agreement in principal [sic] to the acquisition by both corporations must occur before either corporation has a duty to disclose the fact of negotiations to a stockholder." Fed.Sec.L.Rep. at p. 93,517. The district judge allowed that the negotiators may have settled the terms of the deal before December 31 but continued: "Although the *negotiators* may have agreed before December 31, 1983, the *corporations* did not agree until action by their Boards of Directors or other authorized agents." *Ibid.* (emphasis in original).

Judge Leinenweber also concluded that even if wronged, Jordan is not entitled to relief. *Id.* at 93,518. He is not entitled to rescission because he is not employed by Duff & Phelps, and the Agreement ties ownership to employment. (The Franchik exception, according to the court, was at most a breach of the Agreement; because the Agreement was an arrangement among the shareholders, only unanimous consent could modify it.) He is not entitled to damages because the Security Pacific deal fell through.

## II

*Michaels* holds that close corporations that purchase their own stock must disclose to the sellers all information that meets the standard of "materiality" set out in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). See *Michaels,* 767 F.2d at 1194–97. *Michaels* also holds that the special "price and structure" rule, under which public corporations need not disclose impending negotiations for their merger, does not apply to close corporations. See also *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir.1974); *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir.1975); *Nelson v. Serwold,* 576 F.2d 1332 (9th Cir.1978); *Holmes v. Bateson,* 583 F.2d 542, 558 (1st Cir.1978); cf. *Arber v. Essex Wire Corp.,* 490 F.2d 414, 418 (6th Cir.1974). A jury would be free under *Michaels* to conclude that the board's decision of November 14 to seek a buyer for Duff & Phelps—coupled with the fact that at least one putative

buyer thought Duff & Phelps worth $50 million, which casts an important light on the prospect of a profitable conclusion to the search—was "material" under the standard of *TSC Industries*. That is, there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder" and "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 426 U.S. at 449, 96 S.Ct. at 2132 (footnote omitted).

■ Duff & Phelps replies that *Michaels* is inapplicable. The district court agreed, but we do not. The rationale for the price-and-structure rule, which we adopted in *Flamm,* is that firms may need secrecy to obtain the best price. *Flamm,* 814 F.2d at 1175–77. To tell one stockholder of a publicly traded firm is to tell all, letting the cat out of the bag. Security Pacific therefore was entitled to be mum about its plans and to insist that Duff & Phelps also keep matters secret. But a whisper in Jordan's ear would not have revealed anything to the public. Hansen and other members of the executive committee of Duff & Phelps's board already knew about the negotiations, and apparently Hansen had been whispering in Franchik's ear. Because it is possible to inform shareholders of closely held firms about ongoing negotiations without informing the public—because indeed the firm need tell only the few investors from whom it buys stock during the negotiations—*Michaels* rather than Flamm supplies the definition of materiality here.

■ A jury could find that the information withheld on November 16 is "material". A jury also could find that December 30, rather than November 16, is the date of the "sale" of the stock. If December 30 is the date of sale, the information withheld then was "material" under *Michaels* and *TSC Industries* as a matter of law. By then the negotiating teams for Duff & Phelps and Security Pacific had negotiated the price and structure of the deal. (We need not decide whether, had Duff & Phelps been a public firm, it could have

withheld notice to the market at large until the boards approved this agreement in January.) So there are two linked materiality questions for the jury: whether the information withheld on November 16 was material, and whether the sale took place on November 16 or December 30.

Duff & Phelps insists that nothing after November 16 matters. A person who sells stock through a broker has several business days to deliver the certificates; the sale is nonetheless final—with price and disclosure obligations fixed forever—on the date of the deal rather than the date of delivery. Duff & Phelps treats the letter of resignation on November 16 as an irrevocable sale with deferred delivery. Yet if the "sale" occurred on November 16, then under the Agreement the stock would have been valued as of December 31, 1982. That Duff & Phelps valued the stock as of December 31, 1983, may persuade a jury that it treated the "sale" as made on that date. Moreover, Jordan insists that other employees were allowed to withdraw their resignations, and that he could have done so as late as December 31—if, say, his wife and his mother had reconciled. A cabinet officer who resigns (and has the resignation accepted by the President) is out of office and cannot stick around without being nominated and confirmed again; but private parties may decide to give less finality to resignations. The terms on which resignations may be withdrawn may be implicit parts of the relations between Duff & Phelps and its employees, and Jordan is entitled to an opportunity to demonstrate that he could have remained at the firm. If he can prove this, then December 30 rather than November 16 is the date on which the materiality of the firm's omissions must be assessed.

All of this supposes that Duff & Phelps had a duty to disclose anything to Jordan. Most people are free to buy and sell stock on the basis of valuable private knowledge without informing their trading partners. Strangers transact in markets all the time using private information that might be called "material" and, unless one has a duty to disclose, both may keep their counsel. *Dirks v. SEC*, 463 U.S. 646, 653–64,

103 S.Ct. 3255, 3260–66, 77 L.Ed.2d 911 (1983); *Chiarella v. United States*, 445 U.S. 222, 227–35, 100 S.Ct. 1108, 1114–18, 63 L.Ed.2d 348 (1980); cf. *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir.1986). The ability to make profits from the possession of information is the principal spur to create the information, which the parties and the market as a whole may find valuable. The absence of a duty to disclose may not justify a lie about a material fact, but Duff & Phelps did not lie to Jordan. It simply remained silent when Jordan quit and tendered the stock, and it offered the payment required by the Agreement. Duff & Phelps maintains that it was entitled to be silent, as Dirks could trade in silence and tip off his friends, even though it could not have lied in response to the questions Jordan should (in retrospect) have asked but did not.

This argument is unavailing on the facts as we know them. The "duty" in question is the fiduciary duty of corporate law. Close corporations buying their own stock, like knowledgeable insiders of closely held firms buying from outsiders, have a fiduciary duty to disclose material facts. *Kohler* and *Michaels* rest on this duty, as do some of the earliest cases of trading by insiders on material information. The "special facts" doctrine developed by several courts at the turn of the century is based on the principle that insiders in closely held firms may not buy stock from outsiders in person-to-person transactions without informing them of new events that substantially affect the value of the stock. See, e.g., *Strong v. Repide*, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909), and the cases discussed in Comment, *Insider Trading at Common Law*, 51 U.Chi.L.Rev. 838 (1984); cf. *Janigan v. Taylor*, 344 F.2d 781 (1st Cir.1965); but cf. *Freeman v. Decio*, 584 F.2d 186 (7th Cir.1978) (Indiana law does not allow the corporation to recover insiders' profits on trades made with special knowledge); Robert Charles Clark, *Corporate Law* 311–12 (1986) (the common law duty to disclose to selling investors was quite limited).

Because the fiduciary duty is a standby or off-the-rack guess about what parties would agree to if they dickered about the subject explicitly, parties may contract with greater specificity for other arrangements. It is a violation of duty to steal from the corporate treasury; it is not a violation to write oneself a check that the board has approved as a bonus. We may assume that duties concerning the timing of disclosure by an otherwise-silent firm also may be the subject of contract. Section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(a), forbids waivers of the provisions of the Act, and here the critical provision is § 10(b), 15 U.S.C. § 78j(b), and the SEC's Rule 10b–5, 17 C.F.R. § 240.10b–5. But a provision must be applicable to be "waived", and the existence of a requirement to speak is a condition of the application of § 10(b) to a person's silence during a securities trade. The obligation to break silence is itself based on state law, see *Dirks, Chiarella,* and *Barker,* and so may be redefined to the extent state law permits. See, e.g., *Toledo Trust Co. v. Nye,* 588 F.2d 202, 206 (6th Cir.1978) (there is no liability under the securities laws for failing to disclose information that has been made irrelevant by contract, in *Nye* a contract allowing someone to purchase shares at a formula price on a date certain). But we need not decide how far contracts can redefine obligations to disclose. Jordan was an employee at will; he signed no contract.

The stock was designed to bind Duff & Phelps's employees loyally to the firm. The buy-sell agreement tied ownership to employment. Understandably Duff & Phelps did not want a viper in its nest, a disgruntled employee remaining only in the hope of appreciation of his stock. So there could have been reason to divorce the employment decision from the value of the stock. Perhaps it would have been rational for each employee to agree with Duff & Phelps to look to salary alone in deciding whether to stay. A contractual agreement that the firm had no duty to disclose would have uncoupled the investment decision from the employment decision, leaving whoever was in the firm on the day of a merger to receive a surprise appreciation. Some might lose by leaving early; some might reap a windfall by buying just before the announcement; all might think it wise to have as little as possible said in the interim.

Yet an explicit agreement to make all employment decisions in ignorance of the value of the stock might not have been in the interests of the firm or its employees. Duff & Phelps was trying to purchase loyalty by offering stock to its principal employees. The package of compensation contained salary and the prospect of appreciation of the stock. Perhaps it paid a lower salary than, say, Underwood Neuhaus & Co., because its package contained a higher component of gain from anticipated appreciation in the stock. It is therefore unwarranted to say that the implicit understanding between Jordan and Duff & Phelps should be treated as if it had such a no-duty clause; we are not confident that this is the clause firms and their employees regularly would prefer. Duff & Phelps has not identified any firm that adopted such a clause explicitly, and the absence of explicit clauses counsels caution in creating implicit exceptions to the general fiduciary duty.

The course of dealing between Jordan and Duff & Phelps suggests that the firm did not demand that employees decide whether to stay or go without regard to the value of the stock. It apparently informed Jordan what the book value was expected to be on December 31, 1983, so that Jordan could decide whether to leave in November (receiving the value as of December 31, 1982) or stay for another six weeks. The firm did not demand that Jordan depart as soon as it learned he had switched loyalties; it allowed employees to time their departures to obtain the maximum advantage from their stock. The Agreement did not ensure that employees disregard the value of the stock when deciding what to do, and neither did the usual practice at Duff & Phelps. So the possibility that a firm could negotiate around the fiduciary duty does not assist Duff & Phelps; it did not obtain such an agreement, express or implied.

The closest Duff & Phelps came is the provision in the Agreement fixing the price of the stock at book value. Yet although the Agreement fixed the price to be paid those who quit, it did not establish the terms on which anyone would leave. Thus cases such as *Toledo Trust* and *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040 (8th Cir.1977), do not assist Duff & Phelps. These cases dealt with agreements calling for valuation at a formula price on a fixed date. In *St. Louis Union Trust* the date was the death of the employee, the formula was book value. The court of appeals held that there was no need to pay the employee's estate a different price, just because a few weeks later Merrill Lynch went public at a higher price. The employee presumably did not take the possibility of a merger into account in deciding whether to die, and the formula price made "disclosure" irrelevant. *Toledo Trust*, too, discussed a buyback triggered by death. (The contract allowed a departure from the formula price, but as the court observed, the variance clause "merely stated the truism that parties to a binding contract of sale can mutually agree to sale terms different than those set forth in the contract." 588 F.2d at 206.) Jordan, though, exercised choice about the date on which the formula would be triggered. He could have remained at Duff & Phelps; his decision to depart was affected by his wife's distress, his salary, his working conditions, the enjoyment he received from the job, and the value of his stock. The departure of such an employee is an investment decision as much as it is an employment decision. It is not fanciful to suppose that Mrs. Jordan would have found her mother in law a whole lot more tolerable if she had known that Jordan's stock might shortly be worth 20 times book value.

■ The securities acts apply to investment decisions, even those made indirectly or bound up with other decisions, such as employment or entrepreneurship. E.g., *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) (combined investment-entrepreneurship decision); *Norris v. Wirtz*, 719 F.2d 256 (7th Cir.1983) (securities laws apply to a sale of stock by a trustee when the beneficiary has a right to disapprove the transaction, even though the beneficiary does not negotiate its nature or price); *Sulkow v. Crosstown Apparel Inc.*, 807 F.2d 33, 37 (2d Cir.1986) (collecting cases applying Rule 10b–5 to stock that could be sold only at a formula price or to identified buyers). The position of this court that § 10(b) and cognate provisions of the securities laws were designed exclusively to protect passive investors, *Sutter v. Groen*, 687 F.2d 197, 201 (7th Cir.1982), was rejected in *Landreth* and, e.g., *United States v. Naftalin*, 441 U.S. 768, 775–77, 99 S.Ct. 2077, 2082–83, 60 L.Ed.2d 624 (1979). There must be an "investment" decision, to be sure, see *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843 (2d Cir.1986); *Harris Trust & Savings Bank v. Ellis*, 810 F.2d 700, 703–04 (7th Cir.1987); but Jordan unavoidably made one. That he took the value of stock into account is evident from the timing of his departure. A few thousand dollars' increase in book value led the Jordans to stay in Chicago an extra six weeks. How long would they have stayed for the prospect of another $620,000?

Our dissenting colleague concludes that all of this is beside the point because Hansen could have said, on receiving Jordan's letter on November 16: "In a few weeks we will pull off a merger that would have made your stock 20 times more valuable. It's a shame you so foolishly resigned. But even if you hadn't resigned, we would have fired you, the better to engross the profits of the merger for ourselves. So long, sucker." This would have been permissible, under our colleague's interpretation, because Jordan was an employee at will and therefore could have been fired at any time, even the day before the merger, for any reason—including the desire to deprive Jordan of a share of the profits. The ability to fire Jordan enabled the firm to "call" his shares, at book value, on whim. On this view, it is foolish to say that Duff & Phelps had a duty to disclose, because disclosure would have been no use to Jordan. (Perhaps this is really an argument

about "causation" rather than "duty", but the terminology is unimportant.) But Duff & Phelps itself does not press this argument, and in civil litigation an appellate court ought not put words in a party's mouth and use them as the grounds on which to decide. E.g., *Bonds v. Coca-Cola Co.*, 806 F.2d 1324, 1328–29 (7th Cir.1986). The district court has not had an opportunity to address such a claim, and Jordan has not been asked to respond to it. Perhaps Duff & Phelps does not want to establish a reputation for shoddy dealing; as our dissenting brother observes, a firm's desire to preserve its reputation is a powerful inducement to treat its contractual partners well. To attribute to a litigant an argument that it will take every possible advantage is to assume that the party wishes to dissipate its reputation, and the assumption is unwarranted.

■ More than that, a person's status as an employee "at will" does not imply that the employer may discharge him for every reason. Illinois, where Jordan was employed, has placed some limits on the discharge of at-will employees. E.g., *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981); *Zick v. Verson Allsteel Press Co.*, 623 F.Supp. 927 (N.D.Ill.1985) (discussing Illinois law). We do not disparage the utility of at-will contracts; this very panel recently recognized the value of informal (meaning not legally binding) employment relations. *Miller v. International Harvester Co.*, 811 F.2d 1150, 1151 (7th Cir. 1987). See also *Kumpf v. Steinhaus*, 779 F.2d 1323, 1326 (7th Cir.1985); Richard A. Epstein, *In Defense of the Contract at Will*, 51 U.Chi.L.Rev. 947 (1984). But employment at will is still a contractual relation, one in which a particular duration ("at will") is implied in the absence of a contrary expression. E. Allan Farnsworth, *Contracts* 532 n. 29 (1982). The silence of the parties may make it necessary to imply other terms—those we are confident the parties would have bargained for if they had signed a written agreement. One term implied in every written contract and therefore, we suppose, every unwritten one, is that neither party will try to take opportun-

istic advantage of the other. "[T]he fundamental function of contract law (and recognized as such at least since Hobbes's day) is to deter people from behaving opportunistically toward their contracting parties, in order to encourage the optimal timing of economic activity and to make costly self-protective measures unnecessary." Richard A. Posner, *Economic Analysis of Law* 81 (3d ed. 1986). See also, e.g., *Morin Building Products Co. v. Baystone Construction, Inc.*, 717 F.2d 413, 414–15 (7th Cir.1983); *Martindell v. Lake Shore National Bank*, 15 Ill.2d 272, 286, 154 N.E.2d 683, 690 (1958); *Restatement (Second) of Contracts* § 205 (1979).

Employment creates occasions for opportunism. A firm may fire an employee the day before his pension vests, or a salesman the day before a large commission becomes payable. Cases of this sort may present difficult questions about the reasons for the decision (was it opportunism, or was it a decline in the employee's performance?). The difficulties of separating opportunistic conduct from honest differences of opinion about an employee's performance on the job may lead firms and their employees to transact on terms that keep such disputes out of court—which employment at will usually does. But no one, not even Professor Epstein, doubts that an *avowedly* opportunistic discharge is a breach of contract, although the employment is at-will. E.g., *Coleman v. Graybar Electric Co.*, 195 F.2d 374 (5th Cir.1952), discussed with approval in Epstein, 51 U.Chi.L.Rev. at 980–82. See also, e.g., *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657 (1976). The element of good faith dealing implied in a contract "is not an enforceable legal duty to be nice or to behave decently in a general way." *Zick*, 623 F.Supp. at 929. It is not a version of the Golden Rule, to regard the interests of one's contracting partner the same way you regard your own. An employer may be thoughtless, nasty, and mistaken. Avowedly opportunistic conduct has been treated differently, however.

The stock component in Jordan's package induced him to stick around and work well.

Such an inducement is effective only if the employee reaps the rewards of success as well as the penalties of failure. We do not suppose for a second that if Jordan had not resigned on November 16, the firm could have fired him on January 9 with a little note saying: "Dear Mr. Jordan: There will be a lucrative merger tomorrow. You have been a wonderful employee, but in order to keep the proceeds of the merger for ourselves, we are letting you go, effective this instant. Here is the $23,000 for your shares." Had the firm fired Jordan for this stated reason, it would have broken an implied pledge to avoid opportunistic conduct. It may well be that Duff & Phelps could have fired Jordan without the slightest judicial inquiry; it does not follow that an opportunistic discharge would have allowed Duff & Phelps to cash out the stock on the eve of its appreciation. This is the principle underlying *Rao v. Rao*, 718 F.2d 219 (7th Cir.1983), which holds, applying Illinois law, that although an employer may dismiss an at-will employee for the purpose of preventing his becoming a partner, it may not enforce the no-competition clause in the contract even though the contract stated that the clause would become effective if the employee were discharged "for any reason". A short delay would have turned the fired employee into a partner and nullified the restrictive covenant. We concluded that although the discharge was final, the restrictive covenant would not be enforced. So, here, an opportunistic discharge would not necessarily allow Duff & Phelps to buy back the stock. As a result, Jordan's employment at will, the essential ingredient of our colleague's argument that Jordan waived the duty to disclose, does not establish that the firm had no duties concerning the stock.

The timing of the sale and the materiality of the information Duff & Phelps withheld on November 16 are for the jury to determine. Our dissenting colleague stresses that businesses would be shocked to learn that they must disclose valuable corporate information to fickle employees. If disclosure is unthinkable, however, Jordan may have trouble establishing that Duff & Phelps acted with intent to de-

fraud, a necessary element of a case under Rule 10b–5. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Duff & Phelps did not seek summary judgment on the ground that it would be impossible to establish scienter, and arguments about the expectations and intent of the parties are for the jury.

### III

Jordan's complaint, as amended, asks for rescission of the sale of stock. Although Judge Hart allowed the complaint to be amended (over defendants' objection) to seek rescission, Judge Leinenweber held that rescission is unavailable as a matter of law. Judge Leinenweber concluded that the sale cannot be rescinded because employment at Duff & Phelps is a condition of ownership of the stock, one not waived by the settlement with Franchik. Because of the Agreement, Jordan could not own the stock after December 31 and may not own it now. Duff & Phelps has filed a cross-appeal to advance a second reason in support of the court's holding—that Jordan waited too long to seek rescission, waiving his entitlement to it.

The cross-appeal was unnecessary. A party may support a judgment in its favor with any argument preserved in the district court. *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976). Cross-appeals for the sole purpose of making an argument in support of the judgment are worse than unnecessary. They disrupt the briefing schedule, increasing from three to four the number of briefs, and they make the case less readily understandable to the judges. The arguments will be distributed over more papers, which also tend to be longer. Unless a party requests the alteration of the judgment in its favor, it should not file a notice of appeal.

This does not affect the propriety of the argument Duff & Phelps has presented. It is not a strong argument, however. True,

quite a few cases say that delay waives a right to rescission. E.g., *Baumel v. Rosen*, 412 F.2d 571 (4th Cir.1969); *Myzel v. Fields*, 386 F.2d 718 (8th Cir.1967); *Estate Counseling Service v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527 (10th Cir.1962). But most of these cases rely on state law, the relevance of which is unclear. Too, we have doubted the vitality of a rule that, in at least some expressions, is based on a distinction between "law" and "equity" that has been abolished. *Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 984–85 (7th Cir.1978). A prompt demand for rescission is important in allocating risks among parties. If the investor can wait before selecting the relief he wants, he can shift all of the ordinary investment risk to the defendant. If things turn out well, the investor will keep the gains and still demand as damages the difference between the price of the stock and its market value on the day of the transaction; if things turn out poorly the investor will demand rescission. Yet once the investor discovers the fraud, he has an ordinary investment decision to make with respect to the future—to keep (or recover) the stock in hope of gain or to disinvest. Allowing a belated election between market damages and rescission effectively allows him to do both, and therefore visits defendants with expected damages greater than the loss the investor actually suffered. The Uniform Commercial Code solves the problem for commodities subject to price fluctuations by limiting the seller's damages to the unpaid contract price less the market price at the time for delivery, providing an incentive to sell on the market, and limiting the purchaser's damages to the market price at the time the breach is discovered less the contract price, providing an incentive to cover. If either party chooses to speculate after learning of the other's breach, he is on his own tab. UCC §§ 2–706, 2–708, 2–711, 2–713 (1978 official draft). Prompt election in securities law has the same effect. *Randall v. Loftsgaarden*, —— U.S. ——, 106 S.Ct. 3143, 3155, 92 L.Ed.2d 525 (1986). Cf. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1306 n. 27 (2d Cir. 1973).

We need not say more about the effects of delay, however, because Judge Leinenweber's reason is persuasive. Rescission entails the undoing of the deal, the return of the parties to the position they occupied before. Jordan quit on December 31, 1983, and moved to Houston. His employment was a quid pro quo for ownership of the stock. It is too late to restore his employment for 1984–86, and he has not offered to go back to work at Duff & Phelps if he wins the case. We therefore need not discuss whether a district court could force Duff & Phelps to take him back. Jordan is entitled only to damages, as his initial complaint requested. See also Fed.R.Civ.P. 54(c) ("every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.").

But what might the damages be? Judge Leinenweber held that there are none, as a matter of law, because the merger with Security Pacific fell through. Doubtless the news of the deal with Security Pacific was the reason Jordan filed this suit. Yet the rationale of finding a securities violation—if there was one, a qualification we will not repeat—is that Jordan sold his stock in ignorance of facts that would have established a higher value. The relevance of the fact does not depend on how things turn out. Just as a lie that overstates a firm's prospects is a violation even if, against all odds, every fantasy comes true, *Escott v. BarChris Construction Corp.*, 283 F.Supp. 643, 669–70, 675 (S.D.N.Y. 1968), so a failure to disclose an important beneficent event is a violation even if things later go sour. The news, here that some firm was willing to pay $50 million for Duff & Phelps in an arms' length transaction, allows investors to assess the worth of the stock. If one deal for $50 million falls through, another may be possible at a similar price. Investors will either hold the stock or demand a price that reflects the value of that information. The conclusion that because the first deal collapsed there are no damages must reflect a belief that if the firm was not worth $50 million, then it

was worth only $2.5 million (its book value). That is implausible. Security Pacific was willing to pay $50 million because, it concluded, Duff & Phelps was worth that much. If it was worth that much to Security Pacific, it was worth that much to someone else. Some value may be produced by interactions unique to Security Pacific, but there is no reason to think that Security Pacific would pay the investors of Duff & Phelps for the elements of value Security Pacific brought to the deal. The price of an asset usually is what the second-highest bidder will pay. So if Security Pacific bid $50 million, it believed that someone else would pay that much too (or that Duff & Phelps would hold out as part of a risky gaming strategy); otherwise Security Pacific would have bid less. The end of Security Pacific's bid—for reasons unrelated to a reassessment of the value of Duff & Phelps—therefore does not show that Jordan was uninjured. And less than a year later Duff & Phelps sold the firm to a trust (which is to say, to the syndicate of banks that loaned the money to the trust) for about $40 million.

The sticky problem is not whether Jordan can show some damages in principle but whether he can establish causation. See Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a) (limiting recovery to damages "on account of the act complained of"). Because of the Agreement, employment and ownership of the shares were tied. Jordan could sell his stock in two ways: by leaving the firm and receiving book value, or by holding the stock until a merger or LBO and receiving the offered price. Even if the stock was worth more than book value, Jordan could not receive that price without holding on. So it seems that to recover, Jordan must establish that on learning of the negotiations with Security Pacific he would have dropped plans to go to Houston, and that even after the disappointment of the Fed's action that scuttled the deal with Security Pacific Jordan would have stuck around until the end of 1985, finally receiving the payment from the LBO. Judge Hart denied defendants' motion for summary judgment, holding that causation is a question for the jury. We think that right. Because a reasonable investor would not conclude that the withdrawal of one bid implies that there will be no others—and because Jordan would have known of the board's decision to sell the firm—a jury would be entitled to conclude that Jordan would have stuck around. Difficulties with a mother in law are a strain, but families bear strains greater than that for the prospect of financial gain.

It may be, however, that the measure of damages and the problem of causation are linked. The inquiry into causation is an inquiry into probabilities. After Security Pacific backed out, Jordan might have stayed or left; which course he took would have depended on how unhappy his wife was, how attractive other offers of employment were, and how likely a new sale appeared to be. The chance of his remaining was less than 1.00, though greater than 0.00. A trial of the causation question will pit Jordan against witnesses from Duff & Phelps. Jordan will testify that he was sure to stay; Duff & Phelps will try to demonstrate that Jordan's wife was miserable and that everyone at the firm was glum about the prospects of another deal; perhaps Jordan's mother will testify that she really isn't the ogre Duff & Phelps makes her out to be. The result of this unedifying spectacle will be a jury verdict rounding up to 1.00 (victory for Jordan) or down to 0.00 (victory for defendants) a probability that must lie somewhere in between. Whenever a trial converts a probability to a clean win or loss, it overstates the degree of certainty in the world—it introduces rounding error. There may be no escape from rounding error in determining liability, but the remedial stage of a case allows some adjustment.

■ There are two standard measures of damages in securities law. One, the "rescissionary" measure of damages, is based on defendants' gain. The court reverses the transaction and compels defendants to return the purchase price or disgorge any gains they received. Damages based on defendants' gain make the fraud unprofitable and therefore deter wrongdoing. The

other, the "market" measure of damages, is based on the plaintiffs' loss. If the investor sells for $200 a security that on the day of the sale would fetch $1,000 in an arms' length transaction between fully informed parties, he recovers his loss of $800. Securities law uses both of these measures of damages from time to time. See *Randall; Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154–55, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741 (1972); *Harris Trust*, 810 F.2d at 706. Neither the Supreme Court nor ours has determined when the market measure is appropriate and when the rescissionary measure should be used. We need not do so today, either, because the two are the same as applied to this transaction. Jordan sold his stock to Duff & Phelps. That reduced the number of shares outstanding, so that each of the other investors received a larger portion of the ultimate pot of $40 million. They gained *exactly* what Jordan lost—the value of his 1.244% stake in the firm.

■ There are three potential complications. The first is that Jordan "lost" only the value of the merger discounted by the probability that it would be accomplished. If the probability was only, say, 0.5, then Jordan "lost" only half of $646,000 (the maximum payment to him if the merger succeeded and the firm produced the highest "earn out"), less the $23,000 book value he was offered. But the other investors "gained" only this half, too. There was a 50% chance that they would reap $646,000 (less the $23,000 paid to Jordan), and a 50% chance that they would gain nothing. The second complication is that Jordan's salary at Duff & Phelps was less than his salary at Underwood Neuhaus. Jordan's whole package of compensation at Duff & Phelps included a lower salary and a higher possibility of gain through appreciation of the stock. To compute Jordan's "loss", therefore, we must subtract the difference between his salary in Houston ($110,000) and his salary in Chicago ($67,000), or $43,000 per year, from the value of the stock, for as long as Jordan would have remained at Duff & Phelps. But the identity of gain and loss holds here, too: what Duff & Phelps gained from letting Jordan go is the

value of the stock (say, $623,000, after paying the book value), less the bargain element in Jordan's salary (the ability to obtain $110,000 worth of work for $67,000 per year). Whether the damages are based on Jordan's loss or Duff & Phelp's gain, therefore, it appears to be necessary to subtract the present value of the difference in his compensation, for whatever period he would have stayed at the firm. (We say "appears" because the parties have not briefed this issue, and there may be something we do not appreciate; we do not mean to tie the district judge's hands on remand.) The final complication has to do with timing. "Market" damages, measuring Jordan's loss on the date of the sale of stock, value the transaction as of that date, when the outcome was uncertain. "Rescissionary" damages, measuring the other stockholders' gains, often value the transaction as it turned out. This obviously may be a different number ex post, even though the two numbers are identical on the date of the sale. Even here, though, the numbers are closely related. To obtain rescissionary damages, Jordan must prove that he would have stayed. His probability of recovering such damages therefore is less than one, as the market damages on the day Jordan quit are less than the rescissionary measure.

The identity of market and rescissionary damages as of the date of the sale may make it possible to deal with causation without a large rounding error. The probability that Jordan would stay on may be closely related to the probability that a deal could be made. The more likely a beneficial deal, the more likely Jordan would stay. Yet the likelihood of a beneficial deal would be reflected directly in the market measure of damages. The price that would prevail in a transaction among informed investors depends on the probabilities of certain outcomes. Suppose there is one chance in three of each of the following outcomes: merger at $50 million, LBO at $40 million, and no deal (book value = $2.5 million). The expected value of Duff & Phelps then is the sum of these outcomes, divided by three, or $92,500,000/3 = $30,833,333. (We ignore the time value of

money to simplify the calculation.) There were 20,100 outstanding shares, making each worth $1,534.00 in an arms' length transaction on these assumptions. See generally William A. Klein & John C. Coffee, *Business Organization and Finance* 189–98, 273–95 (2d ed. 1986), on the computation of expected values. The further assumption that the probability of Jordan's remaining tracks the probabilities of these different outcomes makes it possible to award, as damages, the difference between the $123.54 per share that Jordan received and the expected value of each share as of December 31, 1983.

We have simplified things by assuming equal probabilities and by looking only at the three events (the $50 million bid, the LBO, and book value) that assumed actual importance; other outcomes were possible. But guidance may be available on such things. Investment banks continually arrange the sale of small firms such as Duff & Phelps. A large investment bank would be able to compute the probability that a firm such as Duff & Phelps could be sold, given an initial show of interest by a buyer. The computation of the expected value as of December 31, 1983, rough as it is, may be more reliable than a jury's guess about whether Jordan's wife would prevail on him to quit. Determinations of the "right price" are staples of securities litigation whenever a court must compare the actual price against the price that would have prevailed under full information. Because the computation of that price appears to kill two birds with one stone, it is an attractive option to pursue.

We do not hold that damages must be based on the comparison of the transaction price ($123.54 per share) against the expected value of the shares. The parties have not focused on this question, and they may have reasons to prefer an all-or-nothing approach under which Jordan receives the value of the LBO if he can show that he would have stayed through the end of 1985. The method we have sketched depends on the assumption that the probability Jordan would stay tracks the probability that the firm eventually would be sold for a premium. The parties may agree that this is a good approximation. If they cannot agree, and if the probability of Jordan's remaining depends on more complex matters such as familial relations or the list in our dissenting colleague's opinion, then the (relative) simplicity of the approach is lost. It may be necessary simply to ask the jury whether Jordan would or would not have stayed through the end of 1985, speculative as the answer may be. We have explored the subject only to show that there are alternative methods of computing damages. The parties and the district judge should address the subject explicitly on remand. So, too, they must determine the effect of the higher salary Jordan received at Underwood Neuhaus. There may be yet other wrinkles in the ascertainment of damages. These and all related issues are for the district court on remand. We mention them only to show that we have not inadvertently prescribed any specific method of calculating damages.

REVERSED AND REMANDED.

CUDAHY, Circuit Judge, concurring:

Both the majority opinion and the dissent argue lucidly and cogently (and ingeniously) their respective points of view. The case is not easy, but I think Judge Easterbrook's remand for trial the more defensible disposition under all the circumstances. Certainly, I agree that under *Michaels v. Michaels*, 767 F.2d 1185 (7th Cir.1985), the price-and-structure rule should not apply here in the case of a closely held company. I write separately only to note my position with respect to the rule.

As my separate opinion in *Flamm v. Eberstadt*, 814 F.2d 1169, 1181 (7th Cir. 1987), makes clear, I have not yet joined in an opinion adopting the price-and-structure rule of disclosure for publicly held companies. Neither have I taken a position opposing the rule. I have merely felt that neither this case nor *Flamm* (where the parties did not argue the issue) is an appropriate vehicle for coming to grips with the application of the rule to mergers of *public* companies. For various reasons, the apparently strong opposition of the Securities and Exchange Commission to adoption of

the price-and-structure rule has not been seriously weighed. *See Flamm*, at 1182 n. 2. While, as indicated, reserving personal judgment on the price-and-structure rule as applied to public companies, I otherwise join fully in the majority opinion.

POSNER, Circuit Judge, dissenting.

A corporate employee at will quit, owning shares that he had agreed to sell back to the corporation at book value. The agreement was explicit that his status as a shareholder conferred no job rights on him. Nevertheless the court holds that the corporation had, as a matter of law, a duty, enforceable by proceedings under Rule 10b–5 of the Securities Exchange Act, to volunteer to the employee information about the corporation's prospects that might have led him to change his mind about quitting, although as an employee at will he had no right to change his mind. I disagree with this holding. The terms of the stockholder agreement show that there was no duty of disclosure, and since there was no duty there was no violation of Rule 10b–5.

The plaintiff, a young man named Jordan, had gone to work for Duff and Phelps as a financial analyst. He had no employment contract; he was an employee at will. See, e.g., *Long v. Arthur Rubloff & Co.*, 27 Ill.App.3d 1013, 1023, 327 N.E.2d 346, 353 (1975). As a junior executive he was permitted to buy modest quantities of stock in the company, which was (and is) closely held. He agreed that if he left the company, whether voluntarily or involuntarily, he would sell back his stock at its book value on the December 31 preceding or coinciding with the end of his employment.

After working for Duff and Phelps for six and a half years Jordan had accumulated about one percent of the company's stock. His stock had a book value on December 31, 1983, of $23,000 (I round all dollar figures to the nearest $1,000). Earlier in 1983 Jordan had decided to leave Chicago because his mother, who also lived in Chicago, didn't get along with his wife. After Duff and Phelps declined to move him to its only other office (Cleveland), he began to explore the possibility of leaving the firm. On November 11, 1983, he accepted a job in Houston, Texas, at a substantially higher salary than his salary at Duff and Phelps ($110,000 versus $67,000). On November 14 he told Hansen, the chief executive officer of Duff and Phelps, that he was quitting, and on November 16 handed him a letter of resignation. At Jordan's request, Hansen agreed that the resignation would not take effect till the end of the year, so that Jordan would get a higher price for his stock. Both men believed that the book value of the stock would be higher on December 31, 1983, than it had been on December 31, 1982, the relevant date if Jordan's resignation took effect before the end of the year.

Hansen did not reveal to Jordan that in the summer he and Jeffries (the other principal officer of Duff and Phelps) had negotiated with some executives at Security Pacific Corporation to sell Duff and Phelps to Security Pacific for $50 million; that had the deal gone through Jordan's stock would have been worth $640,000 rather than $23,-000; that the deal had been nixed in August by higher levels of Security Pacific's management; but that the episode had so encouraged Hansen that at a meeting of the board of directors of Duff and Phelps on November 14 (just before Jordan came to him with the news that he was leaving) he had sought and obtained authority to make active efforts to sell the company.

Negotiations between Duff and Phelps and Security Pacific resumed in December. On December 30, Jordan, who knew nothing of the negotiations, delivered his shares to Duff and Phelps, as his agreement with the company required him to do. The resumed negotiations were successful, and resulted in an announcement in January (1984) that Security Pacific would buy Duff and Phelps for $50 million, contingent on regulatory approval. Shortly afterward Duff and Phelps sent Jordan a check for $23,000 in payment for his stock. Rather than cash the check Jordan brought this suit, seeking damages equal to the value of his stock if he hadn't quit Duff and Phelps and if the deal with Security Pacific went through. It didn't go through. It col-

lapsed the following January when the Federal Reserve Board refused to approve it except on conditions that Security Pacific found too onerous. Jordan amended his complaint, dropping the claim for damages and asking instead for rescission of the sale of his stock to Duff and Phelps. Almost a year later, Duff and Phelps reorganized, and its shareholders exchanged their stock for a combination of cash, notes, and pension rights that Jordan believes to be worth about $40 million.

Rule 10b–5 forbids "fraud or deceit" in the sale or purchase of corporate securities. Jordan does not argue that Duff and Phelps made any misleading statements. He makes nothing of the fact that when he told Hansen he was quitting, Hansen said that the firm had a good potential for growth and that Jordan's shares would rise in value if he stayed. The target of the complaint is not misrepresentation or even misleading half-truths; it is Hansen's omission to tell Jordan that he should think twice about quitting since the company might soon be sold at a price that would increase the value of Jordan's stock almost 30–fold. The statement that Hansen failed to make may have been material, since it might have caused Jordan to change his mind about resigning. I say "may have been material" rather than "was material" because Hansen need not have allowed Jordan to change his mind about resigning. But I shall pass this point and assume materiality, in order to reach the more fundamental question, which is duty. "[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so." *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980).

We should ask why liability for failing to disclose, as distinct from liability for outright misrepresentation, depends on proof of duty. The reason is that information is a valuable commodity, and its production is discouraged if the producer must share it with the whole world. Hence an inventor is not required to blurt out his secrets, and a skilled investor is not required to disclose the results of his research and insights before he is able to profit from them. See Kronman, *Mistake, Disclosure, Information, and the Law of Contracts,* 7 J. Legal Stud. 1 (1978). But one who makes a contract, express or implied, to disclose information to another acts wrongfully if he then withholds the information. The question is whether Duff and Phelps made an undertaking, and therefore assumed a duty, to disclose to any stockholding employee who announced his resignation information regarding the prospects for a profitable sale of the company.

My brethren find such a duty implicit in the fiduciary relationship between a closely held corporation and its shareholders. By this approach, what should be the beginning of analysis becomes its end. A publicly held corporation is a fiduciary of its shareholders, too; yet if Duff and Phelps had been publicly held it would have had no duty to tell Jordan about the company's prospects of being sold. This is the "price and structure" rule, which this circuit adopted in *Flamm v. Eberstadt,* 814 F.2d 1169 (7th Cir.1987)—rightly so, in my opinion. Thus the mere existence of a fiduciary relationship between a corporation and its shareholders does not require disclosure of material information to the shareholders. A further inquiry is necessary, and here must focus on the particulars of Jordan's relationship with Duff and Phelps.

The cases do not establish an automatic duty to disclose, even on the part of closely held corporations, though they are not sheltered by the "price and structure" rule. *Kohler v. Kohler Co.,* 319 F.2d 634, 638 (7th Cir.1963), says that the duty "must be fashioned case by case as particular facts dictate." The court found no duty in that case. *Michaels v. Michaels,* 767 F.2d 1185, 1192–93, 1197–98 (7th Cir.1985), did find a duty, and it is the case most like the present one factually, because it involved a shareholder who, like Jordan, was also an employee. But his status as a shareholder, unlike Jordan's, was not contingent on his remaining an employee. The contingent nature of Jordan's status as a shareholder has a twofold significance. First, it raises

a question about the applicability of the majority's rule requiring disclosure "in the course of negotiating to purchase stock." One may doubt whether there was any real negotiation in this case, for once Jordan resigned he was contractually obligated to sell back his stock at a predetermined price. Second, and more important, the contingent nature of Jordan's status as a shareholder negates the existence of a right to be informed and hence a duty to disclose. This point is central to my dissent and has now to be explained.

Jordan's deal with Duff and Phelps required him to surrender his stock at book value if he left the company. It didn't matter whether he quit or was fired, retired or died; the agreement is explicit on these matters. My brethren hypothesize "implicit parts of the relations between Duff & Phelps and its employees." But those relations are totally defined by (1) the absence of an employment contract, which made Jordan an employee at will; (2) the shareholder agreement, which has no "implicit parts" that bear on Duff and Phelps' duty to Jordan, and explicitly ties his rights as a shareholder to his status as an employee at will; (3) a provision in the stock purchase agreement between Jordan and Duff and Phelps (signed at the same time as the shareholder agreement) that "nothing herein contained shall confer on the Employee any right to be continued in the employment of the Corporation." There is no occasion to speculate about "the implicit understanding" between Jordan and Duff and Phelps. The parties left nothing to the judicial imagination. The effect of the shareholder and stock purchase agreements (which for simplicity I shall treat as a single "stockholder agreement"), against a background of employment at will, was to strip Jordan of any contractual protection against what happened to him, and indeed against worse that might have happened to him. Duff and Phelps points out that it would not have had to let Jordan withdraw his resignation had he gotten wind of the negotiations with Security Pacific and wanted to withdraw it. On November 14 Hansen could have said to Jordan, "I accept your resignation effective today; we hope to sell Duff and Phelps for $50 million but have no desire to see you participate in the resulting bonanza. You will receive the paltry book value of your shares as of December 31, 1982." The "nothing herein contained" provision in the stockholder agreement shows that this tactic is permitted. Equally, on November 14, at the board meeting before Hansen knew that Jordan wanted to quit, the board could have decided to fire Jordan in order to increase the value of the deal with Security Pacific to the remaining shareholders.

These possibilities eliminate any inference that the stockholder agreement obligated Duff and Phelps to inform Jordan about the company's prospects. Under the agreement, if Duff and Phelps didn't want to give him the benefit of the information all it had to do to escape any possible liability was to give him the information and then fire him. This case is just like *Villada v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 460 F.Supp. 1149 (S.D.N.Y. 1978), and the court's words are strikingly apropos:

> It seems to us an extraordinary proposition that a defendant can be charged with *fraud* by its mere neglect to tell a plaintiff facts which might have enabled the plaintiff to persuade defendant to refrain from taking certain action concededly within its own absolute discretion. Such a contention seems particularly absurd on the facts before us. Let us suppose that Merrill Lynch, having failed to dissuade plaintiff from deserting it for Bache, had told him "Well, you'll be sorry because we're going public and the stock you hold will become much more valuable;" and the plaintiff had responded "O.K. in that case I'll wait around until you go public and then desert you for Bache." It seems to us that Merrill Lynch would have been well within its rights if it had—and probably would have—exercised its option forthwith and told plaintiff to find such solace as he could in whatever employee stock option plan Bache might offer him.

*Id.* at 1150 (emphasis in original).

My brethren correctly observe that, "Because the fiduciary duty is a standby or

off-the-rack guess about what parties would agree to if they dickered about the subject explicitly, parties may contract with greater specificity for other arrangements." But, they add, "we need not decide how far contracts can redefine obligations to disclose. Jordan was an employee at will; he signed no contract." It is true that he signed no contract of employment, but he signed a stockholder agreement that defined his rights as a shareholder "with greater specificity." The agreement entitled Duff and Phelps to terminate Jordan as shareholder, subject only to a duty to buy back his shares at book value. The arrangement that resulted (call it "shareholder at will") is incompatible with an inference that Duff and Phelps undertook to keep him abreast of developments affecting the value of the firm.

The majority states that "the absence of explicit clauses counsels caution in creating implicit exceptions to the general fiduciary duty." A similar caution was not evident when this circuit in *Flamm* adopted the "price and structure" rule. That rule allows a publicly held corporation to withhold material information from its shareholders until a corporate transaction is firmed up. Its premise is that the shareholders are compensated for being kept in ignorance, by the prospect of greater gains than if the information were disclosed. Ignorance will cause some shareholders to sell their shares before the transaction takes place, and thus to be losers after the fact; but on average the winners will outnumber the losers; so the shareholders can be assumed to have consented in advance to surrender their right to be informed. The grounds for an inference that Jordan surrendered his right to be informed are stronger. His stockholder agreement, read in light of his status as an employee at will (a status the agreement emphatically declined to modify), waived either explicitly or by implication every pertinent right he might otherwise have had, except to the book value of his shares on the December 31 preceding or coinciding with the end of his employment. Since the company had a right to deprive him of any participation in the profits from a sale of the company, a duty to reveal to

him information about the value of the company would have been empty. If Hansen had wanted Jordan to stay he would have told him about the rosy prospects for selling Duff and Phelps. Evidently Hansen didn't care whether Jordan stayed or not, so he didn't tell him. He could have fired him, or told him and then fired him—possibilities that make my brethren's statement that Jordan "could have remained at Duff & Phelps" highly ambiguous.

Since receipt of the information would have conferred no right on Jordan to benefit from the information, how can the parties be thought to have intended Duff and Phelps to have an enforceable duty to disclose the information to him? There is no duty to give shareholders information that they have no right to benefit from. See *Toledo Trust Co. v. Nye*, 588 F.2d 202, 206–10 (6th Cir.1978); *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 562 F.2d 1040, 1048–54 (8th Cir.1977); *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444, 447 (2d Cir.1971) (per curiam); *Blackett v. Clinton E. Frank, Inc.*, 379 F.Supp. 941, 947–48 (N.D. Ill.1974). By signing the stockholder agreement Jordan gave Duff and Phelps in effect an option (as in *Nye*) to buy back his stock at any time at a fixed price. The grant of the option denied Jordan the right to profit from any information that the company might have about its prospects but prefer not to give him. If Hansen had known of the rule of law that my brethren adopt today, he could have avoided liability simply by telling Jordan that, come what may, December 30 would be Jordan's last day working for Duff and Phelps. Failure to disclose would be immaterial because Jordan could not act on the disclosure. Only because Hansen failed to make Jordan's resignation effective immediately (a generous gesture, which we have given Hansen cause to regret), as he could have done without violating any contractual obligation, is he held to have violated a duty of disclosure.

The case would be different if Jordan had had an employment contract or if he had had the right to retain his stock after

ceasing to be an employee. Then a right to information about the prospects of the company would have been meaningful. Such a right is not meaningful when the employee has no right to act on it. That was Jordan's position. The company could have told him everything yet still have prevented him from benefiting from the information, by firing him.

Was Jordan a fool to have become a shareholder of Duff and Phelps on such disadvantageous terms as I believe he agreed to? (If so, that might be a reason for doubting whether those were the real terms.) He was not. Few business executives in this country have contractual entitlements to earnings, bonuses, or even retention of their jobs. They would rather take their chances on their employer's good will and interest in reputation, and on their own bargaining power and value to the firm, than pay for contract rights that are difficult and costly to enforce. See *Miller v. International Harvester Co.*, 811 F.2d 1150, 1151 (7th Cir.1987); *Tyson v. International Brotherhood of Teamsters, Local 710 Pension Fund*, 811 F.2d 1145, 1147 (7th Cir.1987); *Kumpf v. Steinhaus*, 779 F.2d 1323, 1326 (7th Cir.1985); Epstein, *In Defense of the Contract at Will*, 51 U.Chi. L.Rev. 947 (1984). If Jordan had had greater rights as a shareholder he would have had a lower salary; when he went to work for a new employer in Houston and received no stock rights he got a higher salary.

I go further: Jordan was protected by Duff and Phelps' own self-interest from being exploited. The principal asset of a service company such as Duff and Phelps is good will. It is a product largely of its employees' efforts and skills. If Jordan were a particularly valuable employee, so that the firm would be worth less without him, Hansen, desiring as he did to sell the firm for the highest possible price, would have told him about the prospects for selling the company. If Jordan was not a particularly valuable employee—if his departure would not reduce the value of the firm—there was no reason why he should participate in the profits from the sale of the firm, unless perhaps he had once been

a particularly valuable employee but had ceased to be so. That possibility might, but did not, lead him to negotiate for an employment contract, or for stock rights that would outlast his employment. By the type of agreement that he made with Duff and Phelps, Jordan gambled that he was and would continue to be such a good employee that he would be encouraged to stay long enough to profit from the firm's growth. The relationship that the parties created aligned their respective self-interests better than the legal protections that the court devises today.

My brethren are well aware that Duff and Phelps faced market constraints against exploiting its employee shareholders, but seem to believe that this implies that the company also assumed contractual duties. Businessmen, however, are less enthusiastic about contractual duties than lawyers are, see Macauley, *Non-Contractual Relations in Business: A Preliminary Study*, 28 Am. Sociological Rev. 55, 64 (1963), so it is incorrect to infer from the existence of market constraints against exploitation that the parties also imposed a contractual duty against exploitation. Contractual obligation is a source of uncertainty and cost, and is therefore an expensive way of backstopping market forces. That is why employment at will is such a common form of employment relationship. It is strange to infer that firms invariably assume a legal obligation not to do what is not in their self-interest to do, and stranger to suppose—in the face of an explicit disclaimer—that by "allow[ing] employees to time their departures to obtain the maximum advantage from their stock," Duff and Phelps obligated itself to allow them to do this.

Having earlier in its opinion tried to get mileage out of the fact that Jordan "signed no [employment] contract," the majority later tries to get additional mileage from the observation that employment at will is a "contractual relation." This is the kind of legal half-truth that should make us thankful that our opinions are not subject to Rule 10b-5. Employment at will is a voluntary relationship, and thus contractual in

the sense in which the word contract is used in the expression "freedom of contract." And the relationship can provide a framework for contracting: if Duff and Phelps had not paid Jordan his agreed-on wage after he had earned it, he could have sued the company for breach of contract. But the only element of employment at will that is relevant to this case is that employment at will is terminable at will, meaning that the employer can fire the employee without worrying about legal sanctions and likewise the employee can quit without worrying about them. Freedom of contract includes freedom not to contract.

The distinction between the underlying "at will" relationship and the separate contracts that may grow out of it is well stated in *Nat Nal Service Stations, Inc. v. Wolf,* 304 N.Y. 332, 336, 107 N.E.2d 473, 475 (1952):

> The agreement alleged here was clearly one at will and for no definite or specific time.... It is clear from the complaint and affidavit that neither party obligated itself to do anything. Unless and until plaintiff had offered to place an order for gasoline and the defendants had accepted such offer and filled the order, only then did there come into existence a legal obligation, viz., the obligation of defendants to pay the agreed discount.

My brethren say that *Coleman v. Graybar Electric Co.,* 195 F.2d 374 (5th Cir.1952), holds that employment at will is subject to an implied duty not to be opportunistic; actually *Coleman* rests on the distinction articulated in *Wolf.* "The appellant does not challenge, but concedes, the right of the defendant to discharge him at any time, but asserts that nevertheless should it do so without cause it was impliedly obligated to pay the plaintfff *the commissions earned by him* up until the time of discharge." 195 F.2d at 376 (emphasis added). Coleman had a contractual right to be paid at the agreed-upon rate for work done. Jordan had no contractual right that he would have been deprived of by being fired. His only relevant contractual right was to sell back his shares at book value.

The majority's view that "the silence of the parties" is an invitation to judges to "imply other terms—those we [judges] are confident the parties would have bargained for if they had signed a written agreement" is doubly gratuitous. The parties did not want their relationship dragged into court and there made over by judges. And the parties were not silent. The stockholder agreement provides that Jordan's rights under it do not give him any employment tenure.

The inroads that the majority opinion makes on freedom of contract are not justified by its quotation from my academic writings concerning the purpose of contract law (which presupposes an agreement that the parties regard as legally enforceable) or by the possibility that corporations will exploit their junior executives, which may well be the least urgent problem facing our nation. The majority's statement that "one term implied in every written contract and therefore, we suppose, every unwritten one, is that neither party will try to take opportunistic advantage of the other" confuses the underlying rationale of contract law with the actual requirements of that law, and is anyway irrelevant since the parties decided not to subject the relevant parts of their relationship to the law of contracts and not to give Jordan any contractual protections against being fired. There was no "implied pledge to avoid opportunistic conduct" any more than there were "implicit parts of the relations" giving rise to contractual obligations. (The plaintiff in *Zick v. Verson Allsteel Press Co.,* 623 F.Supp. 927 (N.D.Ill.1985), was sanctioned under Fed.R.Civ.P. 11 for making such an argument!) "The common law doctrine that an employer may discharge an employee-at-will for any reason or for no reason is still the law in Illinois, except for when the discharge violates a clearly mandated public policy." *Barr v. Kelso-Burnett Co.,* 106 Ill.2d 520, 525, 88 Ill.Dec. 628, 630, 478 N.E.2d 1354, 1356 (1985). See also *Criscione v. Sears, Roebuck & Co.,* 66 Ill.App.3d 664, 667–69, 23 Ill.Dec. 455, 458, 384 N.E.2d 91, 94 (1978). "The rule in this state is that an employment at will relationship can be terminated for 'a good reason,

a bad reason, or no reason at all.' " *Id.* at 669–70, 23 Ill.Dec. at 459, 384 N.E.2d at 95, quoting *Loucks v. Star City Glass Co.*, 551 F.2d 745, 747 (7th Cir.1977). "Where discharge was for the purpose of avoiding a benefit [that] the employer was not obligated to provide" (this case precisely), it still is not actionable. *Zick v. Verson Allsteel Press Co., supra,* 623 F.Supp. at 929 n. 4. And of course Jordan was not fired.

And if Duff and Phelps had fired Jordan (or refused to let him withdraw his resignation), this would not necessarily have been opportunistic. One might equally well say (in the spirit of *Villada*) that by trying to stick around merely to participate in an unexpectedly lucrative sale of Duff and Phelps, Jordan would have been the opportunist. The majority says that "understandably Duff & Phelps did not want a viper in its nest, a disgruntled employee remaining only in the hope of appreciation of his stock." I call that "viper" an opportunist.

The majority cites *Rao v. Rao*, 718 F.2d 219, 222–23 (7th Cir.1983), which held, applying Illinois law, that a restrictive covenant that by its terms became effective if the employee was discharged "for any reason" was unenforceable because the employee in question had been discharged in bad faith. That decision provides very weak support for the majority's position in this case. The employee, Hari, had a contract with Mohan Corporation which entitled him, on completing four years of service, to obtain 50 percent of Mohan for $1. Ten days before the four years were up, Hari was fired—precisely so that he would not obtain the 50 percent interest. This court did not suggest that the divestment of Hari was a breach of contract or otherwise unlawful; he apparently had made no such argument. All the court held was that Mohan could not enforce the restrictive covenant. The primary reason was that the covenant was too restrictive, and therefore contrary to public policy. Restrictive covenants are disfavored, and the bad faith displayed by Mohan was an additional reason against enforcing this one. See *id.* at 223–25.

The issue of Duff and Phelps' duty to Jordan is a little more complicated than I have portrayed it. A resolution passed at the November 14 meeting of Duff and Phelps' board of directors provided that any employee who was terminated involuntarily could retain his stock for up to five years. If treated as an amendment to Jordan's stockholder agreement, the resolution would have prevented Duff and Phelps from forcing him to give up his stock by converting his voluntary termination into an involuntary one. There is a question, however, whether the resolution was effective without all the shareholders' consent. Moreover, another provision of the same resolution weakens Jordan's position: "If an employee voluntarily resigns (or gives notice of resignation) from the Corporation, the employee shall sell to the Corporation and the Corporation shall buy all of the Corporation's common stock then owned by the employee at book value." Jordan gave notice of resignation on November 14; and, under the resolution, having given notice he was obligated to sell his stock back to the company at book value.

I would understand, though might not agree, if the majority thought that the issue whether Duff and Phelps had a duty to disclose is unclear enough to warrant a trial. I cannot understand its holding that the duty exists as a matter of law. If, as appears, the holding is that just because Jordan was a shareholder Duff and Phelps had a duty to disclose material information to him, it is inconsistent with the basic premise of the "price and structure" rule (that premise being that a corporation isn't always required to disclose to its shareholders inside information regarding the prospects for selling the corporation), with the proposition seemingly endorsed by the majority that a duty of disclosure can be waived by its beneficiary, with the even more fundamental proposition that duty is a function of circumstances, and with the terms of the stockholder agreement in this case and of the employment relationship to which that agreement was expressly linked. If the holding is, instead, that the duty to disclose wells up from the complex of implied parts of relations, implied under-

standings, implied pledges, usual practices, and other particulars of the relationship between the parties (that is, if the discussion of these things in the majority opinion is anything more than rebuttal of this dissent), then I do not see how the duty can be thought a matter of law, to be imposed by this court without the benefit of a jury's or a trial judge's findings. See *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1205 (7th Cir.1984); *Meyers v. Selznick Co.*, 373 F.2d 218, 222–23 (2d Cir. 1966) (Friendly, J.). I have a similar doubt whether characterizing the dealings between Hansen and Jordan as "negotiations" within the meaning of the rule announced today is a question of law rather than fact.

Although my principal disagreement is with the majority's holding about duty to disclose, I also have reservations about the majority's discussion of causation and damages. The majority is rightly troubled by the issue of causation. If Hansen had made full disclosure to Jordan, what would have happened? Would Jordan have tried to snatch back his resignation? Would Hansen have let him? (He wouldn't have had to. See *Gras v. Clark*, 46 Ill.App.3d 803, 807–08, 5 Ill.Dec. 177, 181, 361 N.E.2d 316, 320 (1977); *Bauer v. Saper*, 133 Ill. App.2d 760, 762, 272 N.E.2d 703, 705 (1971).) Would Jordan's wife have let him? The case on remand will be a soap opera. The majority believes that the issue of causation can be elided by computing damages as follows: ask an investment banker to estimate the value of shares in Duff and Phelps on December 31, 1983, given what Hansen knew on that day; then subtract (1) the book value of the shares plus (2) the difference between Jordan's salary at Duff and Phelps and his higher salary at the Houston firm to which he switched. For illustrative purposes only, the court assumes that the investment banker would find that there was a one-third chance of no sale, a one-third chance of the sale to Security Pacific, and a one-third chance of the reorganization made after the deal with Security Pacific fell through.

I have three reservations about this approach:

(1) The book value of Jordan's shares shouldn't be subtracted from the award of damages. Jordan never received that book value. He didn't cash Duff and Phelps' check for $23,000 in 1984 when he received it, and it is too late to cash it now.

(2) My brethren say they need not choose between "rescissionary damages" and "market damages," because these are the same thing in this case. They are not; for if the proper measure of damages is compensation rather than restitution, the emotional cost to Jordan of remaining in Chicago must be monetized and subtracted from the award of damages. It is a cost that he avoided by going to Houston; hence it is a benefit that Hansen conferred on him by failing to disclose the information about the firm's prospects.

(3) Also, if market damages are the correct measure, Duff and Phelps must be permitted to show that the difference between Jordan's salary from it and from his new employer in Houston was a net benefit to him, rather than merely compensation for giving up a right to buy stock in the new employer. Only if it was the latter would his new, higher salary fairly estimate a cost that Duff and Phelps saved by his departure.

Finally, I do not share the majority's hope that its suggested method of determining damages will answer the question of causation. That question (would Jordan have stayed with Duff and Phelps if he had known what Hansen knew?) depends not on the valuation of the firm by an investment bank (though that valuation may be relevant) but on the answers to the following questions:

(1) What value would *Jordan* have placed on the shares, if he had known what Hansen knew? He is not an investment bank.

(2) What was Jordan's attitude toward taking risks?

(3) How would Jordan have traded off his estimate of the value of his shares—a value he could not have realized immediately even if he had remained with Duff and Phelps—against the higher salary he was

to receive in Houston and against freedom from domestic conflict?

(4) Would Hansen have let Jordan rescind his resignation?

(5) If so, would Jordan still have been working for Duff and Phelps two years later, when the firm was reorganized?

(6) In this connection, how would Jordan have reacted to the collapse of the Security Pacific deal? Would this have precipitated his departure?

The larger the estimated value of Duff and Phelps when Jordan resigned, the less likely it is that he would have resigned. But that is different from saying, as the majority does, that estimating that value "appears to kill two birds with one stone," the second bird being the issue of causation. The basis of this statement is the majority's unduly sanguine assumption that "the probability of Jordan's remaining tracks the probabilities of these different outcomes...." The majority believes that since Jordan presumably would have left Duff and Phelps if but only if he saw no prospect of a sale of the company, the hypothesized one-third probability of no sale is the probability he would have left. Using the court's figures, this would knock Jordan's damages down to $192,000.

If this is what the court is doing, it is breaking with the tradition of expressing causation in either-or terms, and I applaud its boldness. See *DePass v. United States*, 721 F.2d 203, 206–10 (7th Cir.1983) (dissenting opinion). Only it is using the wrong formula for the relevant probability. The probability that Jordan would have stayed if Duff and Phelps had fulfilled its duty of disclosure is not the probability that an investment bank would assign to Duff and Phelp's being sold or reorganized; it is a function of the six factors that I have listed.